[No. S004893. Nov. 27, 1989.]

KENNETH LYNN KLOEPFER, a Judge of the Municipal Court, Petitioner, v.
COMMISSION ON JUDICIAL PERFORMANCE, Respondent.

**COUNSEL**

Canty & Canty, Jones, Mahoney & Brayton and Thomas C. Brayton for Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Louis R. Hanoian and Marc E. Turchin, Deputy Attorneys General, for Respondent.

**OPINION**

**THE COURT.**[*]—The Commission on Judicial Performance (Commission) has recommended that Judge Kenneth Lynn Kloepfer, a judge of the San Bernardino Municipal Court District, be removed from office. On petition by Judge Kloepfer, we consider that recommendation which is based on findings by the Commission that Judge Kloepfer committed five acts of wilful misconduct and twenty acts of conduct prejudicial to the administration of justice that brings the judicial office into disrepute. (Cal. Const., art. VI, § 18, subd. (c). [hereafter section 18(c)];[1] Cal. Rules of Court, Rules for Censure, Removal, Retirement or Private Admonishment of Judges, rule

---

[*] Before Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Eagleson, J., Kennard, J., and Lillie (Mildred L.), J.[†]

---

[†] Presiding Justice, Court of Appeal, Second Appellate District, Division Seven, assigned by the Chairperson of the Judicial Council.

[1] Section 18(c): "On recommendation of the Commission on Judicial Performance the Supreme Court may (1) retire a judge for disability that seriously interferes with the performance of the judge's duties and is or is likely to become permanent, and (2) censure or remove a judge for action occurring not more than 6 years prior to the commencement of the judge's current term that constitutes wilful misconduct in office, persistent failure or inability to perform the judge's duties, habitual intemperance in the use of intoxicants or drugs, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute. The commission may privately admonish a judge found to have engaged in an improper action or a dereliction of duty, subject to review in the Supreme Court in the manner provided for review of causes decided by a court of appeal."

919(b).)[2] In this proceeding we also consider petitioner's claims that the procedures by which disciplinary proceedings against judges are commenced and prosecuted deny due process, and that he suffered prejudice as a result of the delay in instituting proceedings against him.

■ As we explained in *McCullough* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 186, 191 [260 Cal.Rptr. 557, 776 P.2d 259], wilful misconduct occurs when a judge "commits acts (1) which he knows, or should know, are beyond his authority (2) for reasons other than the faithful discharge of his duties. [Citation.] Though a judge must act in bad faith . . . in order to commit wilful misconduct, he need not necessarily seek to harm a particular litigant or attorney; disregard for the legal system in general will suffice. [Citation.] Unlike wilful misconduct, the charge of prejudicial conduct does not require the presence of bad faith. [Citation.] It occurs when a judge, though acting in good faith, engages in conduct which adversely affects public opinion of the judiciary."

■ On review of a recommendation by the Commission this court independently evaluates the evidence taken in the Commission proceedings to determine if the findings of the Commission are supported by clear and convincing evidence sufficient to sustain them to a reasonable certainty. (*Ryan* v. *Commission on Judicial Performance* (1988) 45 Cal.3d 518, 530 [247 Cal.Rptr. 378, 754 P.2d 724, A.L.R.4th 2066]; *Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1].) We do, however, give special weight to the factual findings of the special masters before whom the evidence was presented because they are better able to evaluate the credibility of the witnesses. (*Ryan* v. *Commission on Judicial Qualifications, supra,* at p. 530.)

We then determine if the conduct found to have occurred is a basis for censure or removal and, if so, the appropriate action. In this aspect of our review of the Commission recommendation we recognize the expertise of the Commission in matters involving judicial conduct and therefore give special weight to its conclusions. (*McCullough* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at p. 191; *Furey* v. *Commission on Judicial Performance* (1987) 43 Cal.3d 1297, 1304 [240 Cal.Rptr. 859, 743 P.2d 919]; *Mardikian* v. *Commission on Judicial Performance* (1985) 40 Cal.3d 473, 476-477 [220 Cal.Rptr. 833, 709 P.2d 852].)

Having done so, we reject petitioner's claims of prejudicial delay and denial of due process, and adopt the findings and recommendations of the

---

[2] All references to rules herein are to those rules unless otherwise noted. Rule 919(b) authorizes a petition to this court for modification or rejection of a recommendation of the Commission.

Commission. The record establishes by clear and convincing evidence that petitioner's actions, almost all of which occurred on the bench, cannot be characterized as occasional lapses or isolated instances of misconduct. Rather, as the Commission concluded, a persistent pattern of abuse and arbitrary conduct appears as to which admonition or censure would not be adequate.

## I.

### DUE PROCESS: INVESTIGATIVE FUNCTIONS OF COMMISSION STAFF

■ Petitioner contends in essence that the Commission, which is charged with the duty to take evidence and make findings of fact and conclusions of law incident to making disciplinary recommendations to this court, is not a neutral forum. He argues that the Commission is inevitably influenced by matters outside the record since its own staff makes the initial investigation into, and recommendation to initiate formal proceedings as a result of, complaints regarding the conduct of a judge. This occurs, in the view of petitioner, because the accusatory, investigatory, and adjudicatory functions are combined during proceedings in the Commission.[3]

Petitioner asserts more specifically that in the instant proceeding the Commission staff not only initiated correspondence and investigation prior to the decision to institute formal proceedings, but thereafter continued an investigation parallel to that of the examiners from the office of the Attorney General. The director and the chief counsel of the Commission assertedly participated in the investigation. This involvement and the reliance of the Commission on staff during the ensuing proceedings, petitioner asserts, makes the association of the director, the staff, and the members of the Commission too close "to allow the adjudicatory process to comport with generally accepted standards of due process."

Petitioner identifies no actual bias on the part of the members of the Commission, and offers no authority to support his argument that the procedures to which he objects are constitutionally impermissible. That omission is easily understood for his claim is contrary to existing authority

---

[3] The Commission argues that because petitioner made no prior objection to the proceedings on this basis, he is foreclosed from doing so now. He was not required, however, to engage in the presumptively futile exercise of objecting to procedures adopted by the Judicial Council pursuant to the command of article VI, section 18, subdivision (f), of the California Constitution. The Commission lacks authority to declare those rules invalid. (Cf. Cal. Const., art. III, § 3.5.)

To the extent that petitioner claims that any member of the Commission or its counsel was biased, that claim is waived since he made no effort to disqualify those officers prior to or at the hearing. (Cf. Gov. Code, § 11512, subd. (c).)

upholding similar due-process-based challenges to administrative adjudication pursuant to procedures in which the relationship between the decision-making, investigating, and prosecutorial functions is much closer. (See 1 Koch, Administrative Law and Practice (1985) p. 448, § 6.8; Schwartz, Administrative Law (2d ed. 1983) p. 495 et seq.; 3 Davis, Administrative Law Treatise (2d ed. 1980) § 18:2, p. 343 et seq.)

The Supreme Court rejected a due-process-based challenge to the combination of investigatory and adjudicatory functions of a medical licensing board in *Withrow* v. *Larkin* (1975) 421 U.S. 35 [43 L.Ed.2d 712, 95 S.Ct. 1456]. There the board heard evidence during the investigatory stage, determined if probable cause existed for license revocation proceedings, and subsequently conducted a contested hearing to determine if prohibited acts had occurred and, if so, if the license should be revoked. The Supreme Court recognized that a " 'fair trial in a fair tribunal is a basic requirement of due process' " (*id.* at p. 46 [43 L.Ed.2d at p. 723]), but nonetheless upheld the administrative adjudication procedure.

The Supreme Court explained: "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.' [Citations.] In pursuit of this end, various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable. Among these cases are those in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him.

"The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." (*Withrow* v. *Larkin, supra,* 421 U.S. at pp. 46-47 [43 L.Ed.2d at pp. 723-724].)

After reviewing the several earlier cases in which due-process-based challenges to administrative adjudication had been rejected, the Supreme Court concluded that the procedures under review did not create an unacceptable risk of bias. (*Withrow* v. *Larkin, supra,* 421 U.S. at p. 54 [43 L.Ed.2d at pp. 727-728].) Manifestly the procedure to which petitioner here objects in-

volves even less potential for biased decisionmaking. The initial investigation is by the Commission staff, but once formal proceedings are instituted the prosecutorial function shifts to examiners from the office of the Attorney General. The special masters appointed by this court then hear the evidence, make findings and conclusions based thereon, and recommend action to the Commission, which itself reviews the evidence, independently makes findings and conclusions, and recommends appropriate discipline to this court. The court, however, is the final decision maker and must itself review the evidence and independently assess its weight and relevance.

The procedures do not create an unacceptable risk of bias either on the part of the Commission, or on the part of the court as ultimate decision maker. That during the course of the initial investigation or thereafter the Commission may become aware of the reports regarding the investigation is not a sufficient basis for believing that either the Commission or this court is not, or cannot be, an impartial decision maker. (*McCartney v. Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 519-520 [116 Cal.Rptr. 260, 526 P.2d 268].)

## II.

### DUE PROCESS: PREJUDICIAL DELAY

Commission staff commenced a preliminary investigation into petitioner's conduct following the receipt of complaints in April 1985. In June 1986, he was advised by letter that formal proceedings were to be initiated. Between that date and the filing of formal charges, both the Commission's staff and that of the Attorney General conducted investigations. The formal proceedings commenced with the December 17, 1986, service on petitioner of a notice of formal proceedings, followed by his acceptance of service on January 5, 1987, and submission of an answer on February 20, 1987. Pursuant to rule 907, this court then appointed special masters[4] to hear and take evidence, and report to the Commission.

Petitioner complains both of the delay prior to the notice of formal proceedings, and the subsequent delay of two years until the date of the hearing. He asserts both a violation of the procedural rules governing the Commission, and prejudice from the inability to adequately cross-examine

---

[4] The Honorable Bernard S. Jefferson, retired justice of the Court of Appeal, Thomas T. Johnson, judge of the Los Angeles County Superior Court, and Celia W. Baker, retired judge of the Orange County Municipal Court, West Orange District, were the appointed special masters.

witnesses whose memory of the events had faded, and from his own lack of recall.[5]

## A. RULES OF PROCEDURE

Rule 904 directs that an inquiry be made by the Commission staff into verified complaints of misconduct that are not obviously frivolous or unfounded, followed if appropriate by a preliminary investigation to determine if formal proceedings should be instituted. The Commission is also allowed to make such inquiry and investigation on its own motion without receipt of a verified statement.

Pursuant to rule 904.2 the judge is to be notified if a preliminary investigation is undertaken. Petitioner complains of the delay by the Commission, once these proceedings were undertaken, in complying with rule 905(a): "After the preliminary investigation has been completed, if the Commission concludes that formal proceedings should be instituted, the Commission shall without delay issue a written notice to the judge advising him of the institution of formal proceedings to inquire into the charges against him. . . ." ■ He infers that rule 905(a) notice had to be given no later than the date on which the decision to initiate formal proceedings on any charge had been made, i.e., at the time he was informally advised by letter that proceedings would be instituted.

Petitioner acknowledges that during the period prior to institution of formal proceedings the preliminary investigation was ongoing. Indeed, he concedes that between August 19, 1985, and September 18, 1986, he received seven letters from the Commission asking that he reply to potential charges involving fifty-five incidents. He argues, however, that rule 905(a) creates a right to notice equivalent to a statutory right to speedy trial. Implicit in his claim is an argument that once a decision has been made to initiate formal proceedings with regard to any incident, the Commission must proceed at once regardless of the number or gravity of other incidents that have come to light during the preliminary investigation and are still themselves being investigated.

We reject both claims. Rule 905(a) mandates neither premature institution of formal proceedings nor dismissal for failure to give "prompt" notice with regard to a decision to include one or more incidents in formal charges while the preliminary investigation of other incidents continues. Manifestly petitioner was not prejudiced by the Commission's decision to continue the

---

[5] Petitioner has preserved this issue by filing a petition with the Commission to dismiss the formal proceedings, and in argument before the special masters.

investigation prior to giving notice of formal charges. He was aware of the 55 incidents that were under investigation and thus cannot complain of actual prejudice flowing from this decision.

We have observed before that the procedure of giving notice to a judge that a preliminary investigation is underway is not compelled as a matter of due process. (*McCartney* v. *Commission on Judicial Qualifications, supra,* 12 Cal.3d at p. 519.) It is unreasonable to assume, therefore, that rule 905(a) mandates dismissal simply because notice of formal proceedings is not given on a piecemeal basis. The Commission is not obliged to give notice of formal proceedings until the preliminary investigation is complete.

## B. DELAY PRIOR TO HEARING

■ Twenty-five months ensued between the service of notice of formal proceedings and the hearing in this matter. As noted above, however, petitioner had been advised of the charged incidents during the preliminary investigation. That investigation necessarily included interviews with the persons who were to be called as witnesses. We therefore reject petitioner's claim that this delay was prejudicial to the extent that he implies that any lack of recall should be attributed solely to this delay.

Moreover, the record fails to support petitioner's claims that he or any witness was unable to recall relevant details regarding some incidents, such as the Lucchesi matter. His own testimony that he recalled the incident, testimony that included reference to the case that was being tried when it occurred, refutes any suggestion of prejudice. As to other incidents in which petitioner claims "details" could not be recalled by petitioner or the witnesses (e.g., the Tricinella and Shepherd incidents), no prejudice can be shown. The reporter's transcript and documentary evidence in the form of court records of those proceedings accurately established not only what petitioner said or did, but the circumstances in which he acted. Still other attempts by petitioner to demonstrate that witnesses had testified falsely as a result of the passage of time, fail because he does not identify where in the record the testimony may be found, cannot substantiate his claim that a particular witness was "incorrect in many particulars," or relies on matters that are clearly outside the record.

Since petitioner had early notice of the charges, and the delay between formal presentation and hearing was not unduly prolonged, no presumption of prejudice from delay need or can be indulged in. Petitioner having failed to demonstrate actual prejudice, no basis for dismissal of any charge exists.

## III.

### FORMAL PROCEEDINGS BEFORE THE COMMISSION

██ █ ██ ██ ██ The basis for these proceedings may be summarized as incidents in which Judge Kloepfer is alleged to have displayed a lack of judicial temperament in dealing with litigants, attorneys, witnesses, and attachés, thereby violating canon 3A(3) of the California Code of Judicial Conduct,[6] and to have failed to ensure the rights of defendants in criminal cases who appeared before him. All of the incidents occurred while petitioner was sitting in the West Valley Division of the San Bernardino Judicial District Municipal Court, a division located in Ontario.

The notice of formal proceedings charged petitioner in five counts. The first charged petitioner with abdicating his judicial responsibility to be patient, dignified and courteous to litigants, witnesses, attorneys and others with whom he had dealt in his official capacity. The charge was alleged to be exemplified by, but not limited to, 14 incidents occurring between 1981 and 1985. Petitioner's conduct in 10 of these incidents was found by the special masters and the Commission to be supported by clear and convincing evidence, and to constitute prejudicial conduct.[7]

The second count charged petitioner with abdicating his responsibility to ensure the rights of defendants who appeared before him in criminal cases. Five of the six incidents alleged in support of this count were found true.

The third count charged petitioner with abuse of the contempt power and the power to issue orders to show cause and bench warrants. Six incidents were alleged to support this charge, of which five were found true.

---

[6] All references to the canons herein are to this code. Canon 3A(3): "Judges should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom judges deal in their official capacity, and should require similar conduct of lawyers, and the staff, court officials, and others subject to their direction and control."

The California Code of Judicial Conduct, adapted from the American Bar Association Code of Judicial Conduct of 1972, was adopted by the California Conference of Judges on September 10, 1974, to become effective January 1, 1975. While the canons do not have the force of law or regulation, they reflect a judicial consensus regarding appropriate behavior, and are helpful in giving content to the constitutional standards under which disciplinary proceedings are charged. (*Cannon* v. *Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 707, fn. 22 [122 Cal.Rptr. 778, 537 P.2d 898]; *Spruance* v. *Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 796 [119 Cal.Rptr. 841, 532 P.2d 1209].)

We therefore expect that all judges will comply with the canons. Failure to do so suggests performance below the minimum level necessary to maintain public confidence in the administration of justice.

[7] In determining whether the Commission recommendation should be followed, we consider only the charges sustained by the Commission. (*Ryan* v. *Commission on Judicial Performance, supra,* 45 Cal.3d at p. 526.)

The fourth count charged petitioner with abdicating his judicial responsibility to remain an objective and impartial arbiter, and acting beyond his authority on the basis of unseemly personal involvement in matters before him. Three of the five incidents alleged in support of this count were found true.

The fifth count charged abuse of power in ordering criminal defendants to pay attorney fees, citing 10 such orders in support of the count. Two were found true.

Hearings were held before the special masters in April and June 1987. The special masters submitted their proposed findings and conclusions to the Commission on July 31, 1987. On July 31, 1987, the examiners' objections, and on October 21, 1987, petitioner's objections, to the proposed report were forwarded to the Commission. The final report of the special masters was forwarded to petitioner and the examiners on December 30, 1987. In that report the special masters found 11 incidents of wilful misconduct and 14 incidents of prejudicial conduct.

After consideration of the objections of petitioner and the examiners to the final report of the special masters, and oral argument before it on March 10, 1988, the Commission found that only five of the acts underlying the recommendation of the special masters constituted wilful misconduct and that twenty acts constituted prejudicial conduct. It recommended, however, that petitioner be removed from office.

The conduct underlying each of the counts on which the Commission bases its recommendation follows.[8]

## A. COUNT 1: PREJUDICIAL CONDUCT

The Commission based its unanimous finding that petitioner had engaged in prejudicial conduct by failure to comply with canon 3A(3) in 10 incidents occurring during the 1981-1985 period, each of which was independently found to constitute prejudicial conduct, and to reflect together a persistent pattern of rude, abusive, and hostile behavior. These incidents were, in chronological order:

---

[8] As will be apparent, petitioner's actions during one incident are, in some cases, the basis for findings under more than one count. We do not consider the total number of incidents determinative of the appropriate action, although the number is relevant. (*Furey* v. *Commission on Judicial Performance, supra,* 43 Cal.3d at p. 1307.) In this matter, there is overlap, but the findings on these charges are considered only as evidence that petitioner's conduct offended more than one of the standards to which a judge must conform.

### 1. *Lucchesi*

A pro tem. shorthand reporter was assigned to work in petitioner's courtroom four mornings a week in 1981. She returned for the afternoon if the calendar required it. On the Monday in 1981 on which this incident occurred a jury trial that had recessed the prior Thursday was to continue before petitioner. Because petitioner conducted small claims proceedings prior to his regular calendar, and those proceedings were not reported, the reporter had gone to another courtroom to report a preliminary hearing while the regular reporter was reading back testimony to the jury in another case. Petitioner expected her in his courtroom and was unaware of the reason for her absence.

Policy in the Ontario branch of the municipal court required that a reporter regularly assigned to a judge obtain permission from that judge before being released to work in another courtroom. Noemi Lucchesi, a shorthand reporter assigned to the courtroom of Judge Merriam, received a call from petitioner's bailiff on that Monday asking if she was available to report proceedings in petitioner's court as his reporter was unavailable. In conformity with the court policy, Ms. Lucchesi told the bailiff she might be able to do so, but would have to check with Judge Merriam. The pro tem. reporter who had been reporting the trial in petitioner's court returned to her office next door to that of Ms. Lucchesi, while Ms. Lucchesi was awaiting permission. Ms. Lucchesi informed her that Judge Kloepfer needed a reporter, and she went at once to his court, apologized for being late, and explained the reason to him.

After his reporter explained the reason for her delayed appearance, petitioner called Ms. Lucchesi and accused her of being responsible for the delay of proceedings in his court. He told her this "was not to happen again," and said he would not be treated as a second-class citizen. Ms. Lucchesi understood petitioner to be complaining about her failure to comply with his request that she come to his courtroom to report the trial proceedings and attempted to explain the court policy on obtaining permission to work in another court, but Judge Kloepfer refused to hear Ms. Lucchesi's explanation. Ms. Lucchesi was so upset by petitioner's reprimand and the manner in which it was delivered that she cried and was still distraught later in the afternoon when she told her judge about the incident. She testified that she believed Judge Kloepfer to be generally unpredictable and volatile. He had a reputation of being abusive to employees and to witnesses.

When Judge Merriam later told petitioner of his concern when members of his staff were upset, Judge Kloepfer apologized to Judge Merriam. He apologized to Ms. Lucchesi the day after he had his conversation with her.

Petitioner, admitting that he was "irritated," but denying that he was abusive, explained his conduct. He testified that he had a jury trial in progress, and expected that his reporter would be present. When she arrived he had been waiting an hour. He testified that he learned from her that it was Ms. Lucchesi who had directed her to go to another court to report. He telephoned Ms. Lucchesi because he believed she did not have the authority to direct his reporter to report elsewhere.

The Commission found petitioner's explanation to be inaccurate and disingenuous. The Commission rejected his assertion that he simply made an "appropriate comment" to a court employee. Judge Kloepfer's reporter had testified that she did not recall telling him that Ms. Lucchesi instructed her to go to another department. Ms. Lucchesi was not her supervisor, she did not seek the advice of Ms. Lucchesi on where to report, and Ms. Lucchesi gave her none. The Commission concluded that even accepting petitioner's explanation for his conduct, however, he was rude and abrasive to a court employee, and thereby violated canon 3A(3).

In this incident, as in the majority of those supporting the Commission's recommendation, petitioner challenges both the sufficiency of the evidence to support the findings and the legal conclusion that the actions constitute prejudicial conduct. The record, however, supports the findings of the special masters and the Commission that petitioner angrily berated Ms. Lucchesi, reducing her to tears. While the evidence does not clearly support the finding that he did so because he felt she did not respond quickly enough to his request that she report proceedings in his courtroom, it does support a conclusion that he angrily berated a court attaché, doing so without sufficient inquiry to know whether even a mild reprimand was warranted, because he believed that she was responsible for his not having a reporter and the consequent delay. Petitioner argues that his belief was reasonable. Be that as it may, his response was not. It was, as the Commission concluded, inappropriate and prejudicial conduct. While this incident alone might not warrant discipline it is clearly relevant evidence of a pattern of conduct reflecting a lack of judicial temperament, i.e., an inability to deal evenhandedly with persons with whom he comes in contact in carrying out his judicial duties.

2. *Bartell*

Deputy District Attorney Bartell, who had not previously appeared before petitioner or in the Ontario courthouse in which he sat, was assigned in

August 1982 to the misdemeanor jury trial calendar before petitioner and to handle a case in which another deputy had negotiated a plea bargain. Petitioner asked Bartell the reason for the negotiated disposition. She replied that she did not know, but would be glad to contact the responsible deputy during a recess to find out.

Petitioner responded: "Miss Bartell, you are an embarrassment to the People of the State of California and it's frightening to think that you represent their interests." The statement was made in a reproving tone in a courtroom full of people. Petitioner acknowledged that it was possible that he had said something critical.

### 3. *Elizalde*

In 1982 petitioner questioned Michelle Elizalde, a deputy district attorney, about the written disposition she had submitted to the court, after which he stated in open court that he was appalled that the interests of the People of the State of California rested in her hands, thereby humiliating and embarrassing her.

Although petitioner argues that he has modified the method by which he delivers criticism, and has changed his sometimes hostile and intimidating approach, the Commission noted testimony by witnesses heard in relation to other counts in this proceeding that he continued to be rude, abusive, and hostile. It therefore rejected petitioner's suggestion that it would be appropriate to take no action in this matter.[9]

### 4. *Taylor*

Pro Tem. Reporter Taylor asked a defendant whose guilty plea was being taken in February 1983 to make her responses audible, stating when the defendant nodded her head: "Excuse me. Is that a yes?" Petitioner said to Ms. Taylor: "I'll keep the record in my courtroom. I don't need any court reporter," and went on to berate Ms. Taylor before a courtroom full of people. Ms. Taylor became upset, nervous, and scared at petitioner's "out-

---

[9] Former Deputy District Attorney Goldman testified that when she appeared before petitioner in 1984 he occasionally exploded into "bursts of fury" at witnesses and defendants, and became irrationally angry over things that were not their fault. Deputy District Attorney Guzzino testified that at the time of the hearing petitioner had a reputation in the legal community as lacking judicial temperament. Deputy Public Defender Zavidow testified that between 1981 and 1985 petitioner was rude and intimidating to persons who appeared before him, had an "imperial attitude," and was intolerant and impatient with persons unfamiliar with court procedure.

The Commission findings as to incidents 7, 8, 10, 12, and 13 of the first count also suggest that petitioner did not modify his courtroom attitude after the *Bartell* and *Elizalde* incidents.

burst." Petitioner had never directed the defendant to speak up. His own court reporter testified that when a witness was not giving an audible response she was permitted to ask: "What did you say."

Petitioner had no recollection of Ms. Taylor reporting in his courtroom. He contends now that the proceeding was not one in which the reporter was required, and that there is no evidence that his directives to the court reporter were "inappropriate," and that his conduct was not the type of conduct affecting public esteem for the judicial office. Whether the reporter was required is irrelevant, of course. She was present for the purpose of recording the proceedings. The record established by clear and convincing evidence that petitioner's conduct was inappropriate and was of a nature that affects public esteem for the judicial office. Rather than explaining to the defendant that she must answer audibly, petitioner castigated the shorthand reporter for following a customary practice.

5. *Nehmeh*

On February 14, 1984, Attorney Nehmeh's motion on behalf of her client for a continuance of a misdemeanor drunk driving trial was denied in the master calendar court, and the case assigned to petitioner's court. Her motion to disqualify petitioner (Code Civ. Proc., § 170.6) was denied by the master calendar judge as untimely, and she renewed both motions before petitioner. Petitioner denied the disqualification motion as untimely and then questioned Nehmeh as to the reason the continuance was requested. Although she explained that an out-of-state witness was not available, petitioner asked: "Isn't it true you are psychologically afraid to take a case to trial?" He then asked her how many cases she had tried, and demanded that she name them and the courts in which they had been tried. His tone was angry and insulting. Attorney Nehmeh was embarrassed because her client was present.

The deputy district attorney present in the courtroom corroborated Nehmeh's testimony and recalled petitioner saying that Nehmeh did not try cases, and that she took her client's money without representing them. Petitioner's comments directed at Nehmeh's legal skills were uncomplimentary.

Petitioner recalled the case, and explained that he was concerned whether the case would ever go to trial. From prior discussions he believed that Nehmeh had never tried a case, and he was concerned about her intent and the possible need to grant a further continuance if she did not intend to try the case. He disputes Nehmeh's claim that her client was present when this incident occurred. Regardless of whether the client was present, petitioner

manifested his concern about possible trial delay in an inappropriate and injudicious manner, publicly suggesting that an attorney was incompetent to represent her client.

### 6. *Cooke*

In May 1984, petitioner interrupted a defense witness in this criminal case who had been asked only two questions. He told her that "we have rules in terms of how we proceed here. And you have to understand them. And I don't want to have to re-explain them and have objections.

"First of all, stop, and don't say anything ... First rule is you keep your mouth shut."

The reprimand was given when the witness tried to elaborate on or explain her answer to a question. Petitioner's tone was described as "impatient and angry" and "forceful and intimidating."

Petitioner challenged the accuracy of the reporter's transcript and of the reporter who testified. He believed the witness had been nervous and had made a comment not reflected in the transcript. He wanted to stop her from continuing to talk, but would no longer admonish a witness in this manner. He would instead try to help a witness relax and understand the procedures, and would not make her feel threatened by the rules.

Petitioner argues that in context his direction to the witness to keep her mouth closed was not rude or inappropriate. Our review of the record suggests otherwise. In this incident, as in others, the manner in which petitioner addressed lay witnesses reflects impatience, anger, and an intimidating lack of courtesy in explaining court procedure.

### 7. *Shepherd*

The Commission unanimously found that during a nonjury trial of this criminal case on August 13 and 14, 1984, petitioner was hostile to, criticized and chastised a defense witness, made clear by cross-examining the witness that he disbelieved him,[10] and inappropriately threatened the witness with sanctions.[11] Petitioner was openly hostile to the defense during the

---

[10] Petitioner claimed that it was appropriate for him to admonish the witness for failing to follow proper "procedure" in answering questions, and to warn him that he might be held in contempt if he persisted in doing so. As the Commission observes, however, contempt procedures are not appropriately invoked against an inexperienced lay witness whose answers are merely nonresponsive.

[11] The special masters found all of the allegations of misconduct related to this count to be true except the charge that petitioner had been rude and hostile toward that defense witness.

During the trial petitioner twice held the defendant in contempt for attempting to say something to the court; sentenced the defendant to two days in jail on each contempt finding;

trial, acted in an intimidating manner toward defense counsel,[12] was personally abusive and insulting to the defendant, and made rude references to the physique and personality of the defendant at sentencing. The Appellate Department of the San Bernardino County Superior Court reversed the judgment of conviction for the reason that petitioner had displayed such animosity toward the defendant that the defendant had been denied "even the semblance of a fair trial."

Although the special masters did not include petitioner's cross-examination of the witness in this case as a basis for their recommendation, the record supports the finding of the Commission that petitioner's cross-examination reflected hostility and disbelief. He did not limit himself to questions directed to eliciting clarifying testimony. He told the witness his testimony did not make sense, and engaged in argumentative dialogue, all of which supports the finding of the Commission. ■ Addressing the trial court's overly aggressive examination of a witness in a similar situation, we cautioned that the court must not undertake the role of prosecutor or defense counsel if public confidence in the impartiality of the criminal justice system is to be maintained. We emphasized there that: "It is fundamental that the trial court . . . must refrain from advocacy and remain circumspect in its comments on the evidence, treating litigants and witnesses with appropriate respect and without demonstration of partiality or bias." (*People* v. *Carlucci* (1979) 23 Cal.3d 249, 258 [152 Cal.Rptr. 439, 590 P.2d 15].)

The Commission rejected petitioner's explanation that by his remarks to the defendant at sentencing he was just scolding the defendant to deter future misconduct and his claim that discipline was unnecessary as he had already been sufficiently criticized in the unpublished appellate department opinion reversing the judgment of conviction, a decision that was widely circulated among members of the local bar. The Commission noted that while petitioner asserted that, as a result of those events, he will never again

and lectured the defendant in an insulting and demeaning manner about his physique and appearance. He referred to or described the defendant variously as one of the "Magnificent Seven bad guys"; "macho"; "a person on an egotistical trip that believes 'hey it's all right if I can get away from it—I'm a big guy and I have to answer to nobody' "; "your hormonal situation and your attitudes are so high that you feel you can get away with those things"; "you have biceps that are probably as big as my thigh."

[12] Both the attorney representing the defendant in this matter and Court Reporter Lucchesi (count 1) testified that petitioner's abusive and intimidating behavior deterred them from questioning or challenging his actions because they feared they would be placed in custody. In this latter proceeding, the effect of petitioner's intimidation may well have affected the adequacy of defense counsel's representation of the defendant. Counsel testified that he was intimidated to the point that he felt compelled to withdraw a request to recall a witness, and did not challenge the propriety of the contempt citations directed to this client when they were made.

deliver that type of lecture when sentencing, petitioner has not acknowledged any wrongdoing and has not demonstrated an understanding of the need to reform his conduct.

8. *Tricinella*

In September 1984, Andrew Tricinella appeared as a prosecution witness in a criminal case being tried before petitioner. He had never been in a courtroom before. Although an attorney had interposed an objection to a question put to Mr. Tricinella almost immediately after he began his testimony, Mr. Tricinella began to answer. Petitioner interrupted, and the following "dialogue" ensued:

PETITIONER : "Mr. Tricinella, when someone makes an objection, they are talking to me, not you. If you interrupt again, I would—"

THE WITNESS : "I have never been here before."

THE COURT : "You can be punished with a fine or jail. Keep your mouth shut. It is not directed to you. If there is an objection, it is directed to me. I am the Judge here. You are not. I have to rule on the objection without flak coming from the side. Please remain silent until I ask you to answer the question or sustain the objection, at which point you may not answer the question."

Mr. Tricinella testified that he believed petitioner was going to send him to jail. As a result of the reprimand, he did not want to be involved with the court system again. He felt as if he were on trial. A court reporter who viewed and heard the incident testified that petitioner's remarks were made in an angry and demeaning tone, and that although Mr. Tricinella had tried to answer the question put to him as best he could, petitioner treated him as if he were stupid. This witness also testified that petitioner had a reputation as being rude, impatient and demeaning to witnesses. She had personally observed him to be rude to witnesses on many occasions.

The prosecutor who witnessed this incident testified that petitioner became "furious" with Mr. Tricinella and exploded into a rage. She had never seen a judge become so angry and impatient with a witness who simply did not understand court procedure. Mr. Tricinella told her afterward that he never wanted to come to court again, or to be embarrassed and humiliated that way again. He felt that he was an honest citizen who witnessed a crime, but was made to feel like a criminal. This prosecutor had appeared before

petitioner frequently between March and October 1984. She testified that the incident was not unusual. Petitioner occasionally exploded into bursts of fury at witnesses and defendants, and treated them irrationally, becoming angry at things that were not their fault.

Petitioner claimed that the transcript did not accurately report all of Mr. Tricinella's statements, but conceded that his admonition to the witnesses was "too long" and "maybe a little too harsh." He now argues that admonishing a witness to keep his mouth shut, when coupled with an appropriate explanation of the procedure, while too harsh is neither rude nor misconduct. Again, we adopt the finding of the Commission. In this incident, as in others, petitioner was impatient and discourteous in dealing with a lay witness who obviously did not understand the manner in which testimony is elicited in a judicial proceeding. Such conduct reflects adversely on the judiciary, has a negative impact on public esteem for the judicial process, and is prejudicial to the administration of justice.

### 9. *Mendez*

Jaime Mendez was a defendant in a criminal matter pending before petitioner on February 21, 1985. Because he had arrived late his attorney had not had an opportunity to adequately discuss the case with Mendez, who was Spanish speaking. Counsel therefore requested a continuance at pretrial hearing scheduled for that date. When petitioner learned the reason for the request, he threatened the defendant with incarceration.

Both an audiotape and a written transcript establish that petitioner asked the defendant, through an interpreter, whether he understood that the only way the court could ensure that the defendant would comply with the procedures of the court was to put him in custody. When the defendant failed to reply, petitioner remanded him to custody stating: "Either he does understand or he doesn't, and if he sits there and looks like a bump on a log and has no ability to respond to me that he understands intelligently what is being interpreted to him in Spanish, I have no confidence that he will follow the directions of the court, and therefore I will cage him, in effect, in jail and bring him back . . . uh . . . manacled and he will appear when I order him to appear." Petitioner did not question the defendant prior to threatening him with custody to determine what it was that the defendant did not understand.

Counsel had explained to petitioner that it had not been clear to the defendant, who came from Los Angeles, that he was to report first to the office of the public defender, and that he, the deputy public defender, had

not been able to find an interpreter. Petitioner eventually acquiesced in the request for a continuance and the defendant remained free.

Petitioner conceded that his language might have been inappropriate, but maintained that he was simply attempting to convey to the defendant the idea that "bad things" could happen if he was not able to understand the court proceedings. The Commission unanimously concluded that this incident constituted prejudicial conduct. We agree, and note again that while this incident alone might merit no more than a private admonition, it is evidence of a continuing pattern of misconduct which reflects poor judgment and lack of judicial temperament.

### 10. Saxe

Defendant Saxe appeared before petitioner with his attorney, on October 1, 1985, for a stipulated continuance. During the proceeding, petitioner took a waiver of potential conflict because counsel for Saxe also represented a codefendant. When petitioner asked Saxe if he waived the conflict, Saxe whispered to his attorney that he did not understand what the judge was telling him. Counsel whispered back an explanation, at which point petitioner threatened the defendant with a contempt citation, stating: "Mr. Saxe, I am talking to you, sir, and when I talk to you I expect you to pay attention with [sic] me and not start a conversation with your attorney. Do that again sir, I am going to hold you in contempt of court and jail you."

When the defendant's attorney explained the exchange, petitioner told the defendant that if he did not understand, he was to talk to petitioner. Petitioner's tone was loud and threatening. The defendant believed petitioner was going to send him to jail.

Petitioner testified that he made the statements because he believed the defendant had "tuned him out" and begun talking to his attorney. He also claimed that the attorney involved, who had testified regarding the incident, had a "mistaken recollection" of the events, although the testimony was corroborated by a reporter's transcript.

Once again, petitioner claims that his conduct was not inappropriate, and once again he fails to recognize the injudicious nature of his assumption that the defendant should have known better than to refer to his attorney for a clarification of the explanation being given by petitioner, and of his immediate threat to impose contempt sanctions on the defendant for this perceived transgression. Petitioner's argument that no one was harmed reflects his inability to appreciate the manner in which impulsive, discourteous, threatening, and arbitrary statements by a judge affect public percep-

tion of the judiciary and the justice system. Misconduct of this nature is prejudicial to the administration of justice because it leads the public to question whether justice is administered evenhandedly by the court.

■ Together these incidents reflect a continuing, pervasive pattern of conduct prejudicial to the administration of justice, and an inability on the part of Judge Kloepfer to appreciate the grave nature of the misconduct, thus casting doubt on his protestations that such misconduct will not recur. We adopt as our own the findings and conclusion of the Commission with regard to count 1.

## B. COUNT 2: FAILURE TO ENSURE CRIMINAL DEFENDANTS' RIGHTS

Again by unanimous vote, the Commission found that on five occasions during the 1985-1986 period petitioner abdicated his responsibility to ensure the rights of criminal defendants. The special masters found wilful misconduct in each instance, but the Commission concluded that in three only prejudicial conduct occurred. These incidents were, in chronological order:

### 1. *Dyer*

Defendant David Dyer appeared before petitioner on February 8, 1985, for arraignment on criminal charges and probation violation in four cases, three of which went back to 1980 and 1981. The delay in disposition occurred because the defendant had failed to appear, and in one of the cases counsel had not been appointed for that reason. The defendant appeared without counsel and advised petitioner that he wished to plead guilty. Petitioner failed to notify counsel who had been appointed in two of the cases and proceeded in their absence. He accepted a guilty plea and an admission of probation violation without eliciting proper waivers, and sentenced the defendant without obtaining a probation report or notifying counsel.

Counsel was not appointed or asked to advise the defendant in any of the cases. No presentence report was requested. A total of 1,171 days in custody was imposed.

Based on the record of this proceeding, petitioner's disingenuous claim that the defendant wanted to proceed and that petitioner believed the public defender's representation had concluded earlier, and petitioner's assertion that the probation report would not tell him anything he did not know, the Commission concluded that petitioner's actions constituted wilful misconduct.

While petitioner argues that his omissions in this case amounted to no more than procedural error, the Commission could conclude on this record that petitioner knowingly failed to ensure the constitutional rights of a criminal defendant and did so to avoid the burden of proceedings in which the defendant would have adequate representation. The record supports the conclusion of the Commission that petitioner's actions constituted wilful misconduct.

### 2. *Clark*

Kenneth Clark appeared before petitioner on February 21, 1985, for a misdemeanor pretrial conference. After appearing in propria persona at his prior appearance before petitioner the defendant had retained an attorney, but he had not spoken with the district attorney. Petitioner thereupon remanded the defendant to custody for failing to comply with the court's earlier direction that he report for an interview with an organization that screened for appointment of counsel and for not speaking with the district attorney. When the defendant asked if he might say something, petitioner replied: "You may not."

Clark did not report for an interview because he had retained counsel whom he had arranged to meet at the courthouse for the pretrial conference. Because of a miscommunication he did not meet the attorney, but he did appear as required. He was unaware of the requirement that he speak with the district attorney about a possible disposition. Petitioner did not permit the defendant to explain.

Bail was set for the defendant without the opportunity for a hearing and in the absence of his attorney. He was jailed until he was able to post bail.

The special masters found that petitioner had acted in bad faith in this incident, and therefore concluded that his actions constituted wilful misconduct. The Commission found the actions to be only prejudicial conduct.

Petitioner concedes that he should have permitted the defendant to speak, and regrets making the order remanding him to custody without opportunity to explain. He claims, however, that his conduct was atypical and is unlikely to recur. We disagree with petitioner's characterization of his conduct as atypical. To the contrary, it is all too typical of his pattern of discourteous remarks, threats and intimidation, and punitive rulings made on the basis of unfounded assumptions. The findings of the Commission and its conclusion that this incident constituted prejudicial conduct is supported by clear and convincing evidence.

### 3. *Pearson*

Counsel for defendant Pearson appeared before petitioner on February 22, 1985, for a scheduled hearing on a suppression motion. He had made all appearances on behalf of the defendant who had not been ordered to appear in court, and counsel had advised petitioner at this proceeding that "under the code I can appear even though if [*sic*] she's not here." Petitioner nonetheless issued a $5,000 bench warrant for the arrest of the defendant.

Petitioner now claims that he lacked confidence in counsel's authority to appear on behalf of the defendant, but did not offer this explanation earlier. He argues that based on counsel's representation regarding two other clients on behalf of whom he had appeared before the Pearson matter was called, he reasonably believed that the defendant had not authorized counsel to appear. He does not satisfactorily explain, however, why his doubts regarding counsel's veracity justified issuance of a bench warrant for the client, rather than a continuance and an order that the defendant appear. Petitioner's suggestion that he was justified in issuing the warrant because the attorney said he might as well issue a warrant is also unavailing as is his suggestion that because the warrant was not issued immediately counsel could have produced his client and caused the warrant to be withdrawn. Issuance of the warrant was proper only if the defendant had been ordered to appear and failed to do so. (See Pen. Code, § 978.5.) Petitioner's explanation suggests an abdication of his responsibility to determine whether the presence of the defendant was necessary before her presence was required, and an abuse of his power to issue warrants.

The special masters found that this action constituted wilful misconduct. The Commission found only prejudicial misconduct.[13] Clear and convincing evidence supports the finding and conclusion of the Commission.

### 4. *Dow*

On August 26, 1985, when petitioner assigned this criminal case to another judge for trial, the defendant's counsel advised petitioner that he planned to file an affidavit of prejudice against that judge during the recess. Counsel did not have the preprinted form with him, and petitioner refused him an opportunity to get the form. Petitioner invited counsel to make the motion orally, and heard counsel's sworn statement that he believed the

---

[13] Counsel for the Commission argue that petitioner acted as he did in order to punish counsel, who had not been adequately prepared in representing defendant in matters heard earlier. The brief concedes, however, that the Commission "apparently accepted petitioner's claim that he did not act in bad faith. . . ."

judge was prejudiced and should be disqualified. Counsel cited "Penal Code section 170.6," rather than Code of Civil Procedure section 170.6.

Petitioner denied the motion even though he assumed it was made under the correct section, had not advised counsel of the manner in which the motion was deemed insufficient, and knew what counsel was attempting to do on behalf of his client. In these proceedings he explained that the motion was defective because counsel had stated that the judge he sought to disqualify was "prejudiced," rather than stating in statutory language that the defendant believed he "could not receive a fair trial" before that judge. He did not believe that trial before a prejudiced judge should be equated to inability to obtain a fair trial. He continues to assert that his denial of the motion was proper.

The Commission found this to have been prejudicial conduct, reducing the severity of the finding from that of the special masters who found the action to have been taken in bad faith. We agree that this conduct was at least prejudicial conduct. ■ A disqualification motion made under Code of Civil Procedure section 170.6 does not require a showing of actual prejudice. Under the statute, the defendant's right to peremptorily disqualify a judge on timely motion is automatic. (*McCartney* v. *Commission on Judicial Qualifications, supra,* 12 Cal.3d at p. 531.) After denying counsel the opportunity to obtain the preprinted form on which to make his motion, petitioner denied the oral motion he invited on the wholly irrelevant ground that the motion was not worded in the exact language of the statute.

5. *Padilla*

Defendant John Padilla appeared in propria persona before petitioner on December 6, 1985, in a probation violation matter that had already been continued several times pending resolution of a "driving under the influence" case then pending in the Los Angeles County Judicial District. The same conduct was alleged as the basis for each proceeding. Petitioner granted another continuance, but ordered the prosecutor to obtain the police reports and be prepared to prove the probation violation on January 10, 1986.

Defendant appeared on January 10, 1986, again representing himself, and presented a copy of a docket sheet reflecting dismissal of the Los Angeles matter on January 6, 1986, on motion of the prosecutor. The probation violation hearing then commenced even though the defendant explained to petitioner that the Los Angeles matter had been dismissed because the defendant had not been the driver of the car. The arresting officer gave hearsay evidence in an effort to establish that the defendant had been the

driver. When petitioner then asked the defendant if he had any questions to put to the prosecution witness, the defendant stated that he needed counsel and had been advised by the public defender in the Los Angeles matter that the probation violation would be disposed of when he advised the court of the dismissal.

Defendant had never waived counsel. Petitioner nonetheless denied defendant's repeated requests for counsel, found the charged violation true, and remanded the defendant to custody. The public defender was appointed only when the defendant appeared for sentencing, and on January 17, 1986, petitioner sentenced the defendant to six months in the county jail.

The defendant filed both a notice of appeal and a petition for writ of habeas corpus. Notwithstanding the pendency of the appeal, but pursuant to a stipulation by counsel, petitioner reasserted jurisdiction in the matter, set aside the sentence, and released the defendant from custody. On February 14, 1986, the public defender filed an affidavit of prejudice against petitioner which petitioner denied even though he recognized that this was the first appearance by counsel. He then set the probation violation matter for a new hearing before himself on March 7, 1986. After a hearing on that date, at which only hearsay evidence supported the violation charge, and three witnesses testified that the defendant had not been driving the car, petitioner again found the defendant to be in violation of probation and sentenced him to four months in jail. Petitioner imposed sentence without arraigning the defendant for judgment or permitting counsel an opportunity to argue the sentencing issue.

Witnesses who observed the initial hearing testified that the defendant was clearly unable to effectively represent himself at the hearing, during the course of which he made additional requests for counsel, acknowledged that he had been "intoxicated," but denied that he had been driving the vehicle involved in the Los Angeles prosecution.

The Commission rejected petitioner's explanation that because the defendant had appeared without counsel when he pleaded guilty to the charge on which probation was granted, he believed in good faith that counsel had been waived at the time of the revocation hearing, and found petitioner's actions in this proceeding constituted both wilful misconduct and prejudicial conduct.[14]

---

[14] Counsel for the Commission go far beyond the findings of the special masters or the Commission in speculating as to petitioner's motives in this and other incidents. Here they argue that petitioner improperly asserted jurisdiction over the case and entered the order setting aside the judgment in order to shield himself from appellate review of his conduct and to ensure that he would retain the power to hear the matter and impose judgment.

The same deputy attorneys general who prosecute matters before the Commission act as counsel for the Commission when review of a Commission recommendation is before this

Petitioner contends that none of these actions constituted misconduct, including his failure to inquire before proceeding with the revocation hearing whether the defendant waived the right to counsel. His argument, that he reasonably assumed the defendant's prior appearances without, counsel reflected a continuing waiver is unpersuasive. It is apparent that, since the defendant had expected a dismissal, was unprepared for the hearing, and the hearing involved contested factual issues, it was unlikely that the defendant would be able to competently represent himself. Petitioner's insistence on proceeding to hearing without obtaining a waiver of counsel, his subsequent refusal to appoint counsel, and the means by which he reasserted jurisdiction over the case after recognizing his error,[15] all support the conclusion of the Commission.

## C. COUNT 3: ABUSE OF CONTEMPT POWER AND POWER TO ISSUE ORDERS TO SHOW CAUSE AND BENCH WARRANTS

The Commission's finding that petitioner abused his contempt power, and his authority to make orders to show cause and issue bench warrants, is based on five incidents during 1984 and 1985, some of which also underlie prior counts and are considered here not as independent incidents, but as evidence relevant to the appropriate discipline. As to the first four incidents involving the contempt power, the Commission found that petitioner had engaged in prejudicial conduct. In the fifth, involving issuance of orders to show cause and bench warrants, the Commission found both wilful misconduct and prejudicial conduct.

court. They repeat the reasoning and argument urged before the special masters to support discipline, even when the Commission did not agree with the findings of the special masters or gave petitioner the benefit of the doubt as to sufficiency of the evidence on issues such as bad faith.

We hesitate, therefore, to characterize some of the argument as that of the Commission, and have omitted reference to most of the speculative effort to ascribe improper motives to petitioner's conduct. It is true, however, that petitioner had no jurisdiction to set aside the judgment once the notice of appeal had been filed. Since the municipal court has no jurisdiction in habeas corpus, petitioner could not act on the assumption that, because he could grant that relief, it was proper to accelerate the process by reasserting jurisdiction over the probation violation matter.

[15] By reasserting jurisdiction over the matter, notwithstanding the pendency of the appeal, petitioner denied the defendant the right he would otherwise have had upon reversal to peremptorily disqualify him from hearing further matters in the case. (See Code Civ. Proc., § 170.6, subd. (2).) While petitioner's actions in this and other cases might permit an inference that he intended to deny this defendant that opportunity, and thus engaged in wilful misconduct, we cannot say that the evidence of such intent is clear and convincing. His conduct of the initial revocation hearing in which the defendant's requests for counsel were denied is independent support for the conclusion of the Commission that this incident constituted wilful misconduct, however.

### 1. *Shepherd*

On August 14, 1984, petitioner summarily adjudged a criminal defendant appearing before him (see *ante,* at p. 844) to be in contempt. He did so when the defendant asked "how come" after his request to say something was rebuffed by petitioner. Without prior warning or explanation, petitioner ordered: "You are in contempt of court. I cite you for contempt of court. I will fine you at the end of these proceedings." In further response to the defendant's protestation "but—," petitioner said: "Sir, you are again in contempt of court."

The defendant had apologized to the court, explaining that he did not know how court procedures operated and did not know he was not allowed to speak. The defendant's attorney also apologized on his behalf. Petitioner nonetheless sentenced the defendant to two days in jail on each contempt finding.

Petitioner testified that the defendant had spoken in an angry tone of voice and "looked like he was fuming." He believed it was inappropriate for the defendant to speak out after the verdict was given, and citing the defendant for contempt "did the trick."

Other witnesses in the courtroom at the time testified, however, that the defendant was "quite humble" and did nothing to warrant the contempt citation. He was not loud, angry, or disrespectful when he asked to address petitioner. The defendant's attorney testified that his client had been surprised and confused by the court's verdict that had been just announced and wanted to make an inquiry of the court. Petitioner's tone was described as angry and demeaning.

### 2. *Tricinella*

In this matter, described above on page 846, on September 11, 1984, petitioner threatened a witness with fine or jail when defense counsel objected that his answer to the prosecutor's question was not responsive. He may have done so because the witness continued to speak after the objection was interposed, but the reporter's transcript of the trial does not reflect any statement by the witness made after the objection and before the threat.

### 3. *Cotterman*

Lynn Cotterman was in defendant's courtroom as a spectator on January 8, 1985, because a preliminary hearing was to be heard in a matter in which her brother was the defendant. During sentencing in an unrelated case, she

stood up to leave the courtroom but tripped over her son's feet and struck her knee on a bench. Petitioner cited her for contempt when she said "shit," ordered her held in custody, and shortly thereafter heard her explanation and apology.[16] He nonetheless found her in contempt and ordered her to serve six hours in jail. She was subsequently released with four and one-half hours of the sentence set aside after her brother's attorney interceded on her behalf.

Petitioner explained that he believed Ms. Cotterman's expletive was a comment on the proceedings before the court at the time. Had he believed her explanation that her comment was a reflexive response to tripping and hitting her knee, he would have absolved her of the contempt citation. He sentenced her, however, without making any inquiry to clarify or confirm the inference he drew. The special masters and the Commission necessarily rejected petitioner's explanation in finding this conduct to be an abuse of the contempt power and, as such, prejudicial conduct.

### 4. *Day/Follman*

Misdemeanor defendant Day was released on posting 10 percent bail on August 17, 1985,[17] notwithstanding a docket entry stating she was not eligible for release on that basis. The bail was posted in her name. She signed for it. Follman, who had apparently provided the funds, but had not agreed that the money could be used to pay any fine imposed on the defendant, was given the receipt for the bail.

On September 3, 1985, Day failed to appear. Petitioner issued an order to show cause to Follman, directing him to show cause why he should not be required to post the balance of the bail. Notice was sent to Follman that a hearing was set for September 16, 1985, and when he did not appear, petitioner issued a $1,000 bench warrant for his arrest.

---

[16] As Ms. Cotterman regained her balance and began to walk out, petitioner told his bailiff to "grab that blonde lady for contempt of court." The bailiff did, and Ms. Cotterman was taken to the jury box where she was scared and began to cry. After her explanation that she had tripped over her son, and her apology, she was sentenced, taken to the county jail handcuffed to another woman, and held for one and one-half hours until being returned to the courtroom. Petitioner released her, stating that she would not have to serve the rest of the time because her son was upset, but if it happened again she would be sentenced to five days in jail.

[17] Former section 1269d of the Penal Code then authorized the release of persons held pending trial on misdemeanor charges upon posting of 10 percent of the amount of bail fixed for the offense. The defendant was required to execute a release agreement, appearance bond, and, if required by the court, an agreement to specified terms or conditions to assure his appearance in court. Having done so and deposited the appropriate sum, the defendant was entitled to be discharged from custody.

Petitioner explained that when he learned that his order prohibiting 10 percent bail had not been complied with he undertook to inquire into the reason, discovered that Follman had provided the funds for the 10 percent bail, and believed that Follman had acted illegally by posting the bail because even if the 10 percent provision had been applicable, the sum must be posted by the defendant. He ordered Follman to appear because he wanted to find out the address of the defendant and why that happened.

Court records, however, indicated the probable reason for the release—the courtroom clerk had not entered the restriction on 10 percent bail on the order committing the defendant to the custody of the sheriff. Nothing in the record supported petitioner's belief that Follman had acted as an "unlicensed bondsman" or gave reason to believe that he was a person subject to the court's jurisdiction or power simply by reason of having possibly supplied a defendant with funds to pay a bail fee. (See Code Civ. Proc., § 128.)

The Commission concluded, as had the special masters, that because petitioner knew, or should have known, that his assertion of jurisdiction over Follman was beyond his authority, and he acted in bad faith, this conduct was wilful misconduct. We agree. ▆▆▆ Ordering a person to appear in court when no matter requiring his attendance is pending constitutes serious misuse of the judicial office. (See *Cannon* v. *Commission on Judicial Qualifications, supra,* 14 Cal.3d at pp. 701-702, fn. 19.)

5. *Saxe*

In this incident (see *ante,* at p. 848), in October 1985, petitioner threatened a criminal defendant with contempt because he whispered to his attorney. The Commission concluded that petitioner engaged in prejudicial misconduct under this charge also.

▆▆▆ We adopt the findings and conclusion of the Commission as to each of the incidents in which petitioner used or threatened to use the contempt power. In the Saxe incident petitioner assumed without inquiry that the defendant was being disrespectful and resorted to a threat to use his contempt power as the means by which to force a termination of the communication. In the Cotterman incident he assumed erroneously, and again without inquiry, that Ms. Cotterman was being disrespectful and that her comment was directed to the proceedings. He exercised his contempt power in circumstances in which a reprimand, or at most exclusion from the courtroom, should have been sufficient to maintain order and prevent disruption. And rather than explaining or affording counsel the opportunity to explain to Tricinella, a lay witness, why his testimony was not responsive, petitioner treated the objectionable answer as a contempt. In the Shepherd matter the

defendant was held in contempt for attempting to speak when a simple admonition that he should address the court through counsel or should seek leave to address the court should have been sufficient.

██ Because it carries with it a "heightened potential for abuse" (*Taylor* v. *Hayes* (1974) 418 U.S. 488, 500 [41 L.Ed.2d 897, 908, 94 S.Ct. 2697]), the contempt power should be the last resort of a judge in maintaining control in his courtroom. It should be used with "great prudence and caution" (*Furey* v. *Commission on Judicial Performance, supra,* 43 Cal.3d at p. 1314; *People* v. *Turner* (1850) 1 Cal. 152, 153), and never to intimidate litigants and witnesses, or in a manner that interferes unnecessarily with a litigant's ability to consult with counsel. Petitioner's injudicious response in these incidents abused the contempt power and the power to issue orders to show cause. As such it was prejudicial misconduct, and in the Follman incident, wilful misconduct.

## D. Count 4: Failure to Remain Objective

The Commission found that petitioner failed to remain objective and became personally involved in matters before him on the basis of three incidents.

### 1. *Giella*

On May 7, 1981, after the prosecutor moved to dismiss a receiving stolen property charge against a criminal defendant, believing that the charges could not be sustained without evidence that had been ordered suppressed, petitioner refused to dismiss this case. He told the prosecutor that he had read the police report and there was enough evidence available to permit the trial to continue. Petitioner also stated that he felt the defendant was guilty, but denied an oral disqualification motion that was then made by defendant's counsel.

The Commission finding of prejudicial misconduct[18] in this matter is based on petitioner's refusal to disqualify himself even though he had prejudged the case. In so doing, the Commission implicitly rejected petitioner's testimony that he did not recall expressing a view regarding the defendant's guilt,[19] and petitioner's argument that because counsel stated the motion

---

[18] The special masters had found wilful misconduct.

[19] The disqualification motion was made in chambers in the absence of the court reporter.

was made under Code of Civil Procedure section 170.5, it was properly denied as untimely.[20]

## 2. *Bowman*

The deputy district attorney prosecuting this misdemeanor embezzlement case was called away by a family emergency after the first day of trial. The deputy assigned to take over the case requested a continuance to prepare, but three jurors indicated that they would be inconvenienced if the matter were put over to the following Monday. Without inquiring as to the nature of the inconvenience, petitioner expressed his view that the case was not complex and that it should not take counsel more than one-half hour to prepare. He denied the requested continuance, but declared a recess until 1:30 p.m. of the same day.

During the recess the People sought to compel the granting of the motion by filing a petition for writ of mandate in the superior court. Counsel advised petitioner after the recess that a writ was coming, but petitioner ordered a witness to take the stand, denied another request for a continuance, and threatened the prosecutor with a contempt citation if the matter were raised again.

An alternative writ was issued, and was served on petitioner shortly thereafter. Petitioner declared a recess and announced that he was going to call the superior court judge who had issued the writ. When he was unable to do so, he declared a recess until the following morning, not to the date requested and stated in the alternative writ. After the prosecutor advised petitioner that he might have to seek further relief, petitioner criticized him and the office of the district attorney for their lack of preparation and the filing of the petition for writ of mandate, and expressed regret that he had granted the continuance.

The prosecutor sought and, on the next day was granted, a second alternative writ ordering petitioner to grant the requested continuance or show cause why he should not be ordered to do so. Petitioner then excused the

---

[20]Former section 170, subdivision (5) (now § 170.1, subd. (a)(6)), required a judge to disqualify himself or herself if the judge believed for any reason that he could not be impartial. No motion was or is necessary to trigger this obligation, which is one independently imposed by canon 3C(1): "Judges should disqualify themselves in a proceeding in which their disqualification is required by law, or their impartiality might reasonably be questioned, including but not limited to instances where:

"(a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings."

jury, attributing to the prosecutor responsibility for any hardships the jurors might suffer as a result. Two of the jurors then explained that they had planned to be out of town on the Monday to which the continuance had been requested, and the parties agreed to a mistrial.

Petitioner later "angrily" asked the chief deputy district attorney why the writ had been sought, called a meeting with senior members of the branch office of the district attorney to express his displeasure with the handling of the Bowman case which made him "look bad," and remained angry at the office for "pulling a fast one" on him. Finally, on April 29, 1983, petitioner distributed to all judges in the county, the public defender, and the district attorney, a memorandum he had authored on the topic of extraordinary writs. The memorandum was critical of the district attorney for seeking, and the superior court for granting, the writ.

The Commission found that petitioner had wilfully failed to comply with the alternative writ, and had thereafter displayed unseemly personal involvement in the matter. It concluded that the acts constituted wilful misconduct and prejudicial misconduct. ■ We conclude, however, that the evidence supports only a finding of prejudicial conduct.[21]

## 3. *Marshall*

On June 6, 1984, petitioner stated at the end of a preliminary hearing on a felony complaint charging this defendant with 13 theft-related offenses,

---

[21] The special masters found that misconduct was not shown by clear and convincing evidence in this matter.

Counsel for the Commission speculate that they did so because petitioner might have been justified by the fact that the prosecutor improperly made his motion for a continuance and presented the writ to petitioner in the presence of the jury.

This incident does reflect unseemly personal involvement, and prejudicial conduct, when petitioner undertook to criticize the office of the district attorney for exercising its right to seek extraordinary relief. However, the record does not establish misconduct in a wilful refusal to obey the writ. Notwithstanding the argument of the Commission that the writ was a "peremptory writ on its face" because the return date fell after the date to which the trial was to be continued, an alternative writ is just that. It gives the respondent an option to comply, or to show cause before the issuing court why the court should not order the respondent to grant the relief sought by the petitioner. Therefore, unless the superior court had ordered a stay of proceedings pending disposition of the petition for writ of mandate, petitioner was free to continue the trial. While the Commission argues that the evidence supports an inference that petitioner understood the writ as requiring him to continue the matter for the full period, the fact that it was worded as an alternative writ and set forth a return date casts doubt on whether it should have been treated as a peremptory writ. This precludes finding clear and convincing evidence of wilful misconduct in petitioner's failure to obey the writ.

We note, however, that since petitioner was the respondent in the writ proceeding, his attempt to communicate ex parte with the judge before whom that matter was pending was itself improper. (Gov. Code, § 68070.5, subd. (b).)

that the defendant was "fraudulent, a liar, and deceitful." He increased the $13,000 bail that had been posted by the defendant's grandmother to $150,000, and ordered that attorney fees of $1,500 for representation by the public defender be paid and taken from the bail already posted. When advised of the source of the bail, petitioner responded that perhaps she was another victim.

The bail was increased even though the prosecutor had advised that the defendant's record did not indicate that he was a flight risk, and had not requested the increase in bail. The defendant had made all court appearances. He was married and had a young child. He had no criminal record or prior contacts with law enforcement.

 At the time petitioner ordered payment of attorney fees, the public defender's office continued to represent the defendant,[22] and the court's docket reflected that the person who posted the bail had refused permission to use the funds for costs.[23] The fee award was nonetheless taken from that bail pursuant to petitioner's order.

Implicit in the inclusion of this incident in count 4 is a conclusion by the Commission that petitioner's actions in this matter reflected a personal involvement, or distaste for the defendant which overrode objectivity. The Commission concluded that petitioner's actions in this matter constituted prejudicial misconduct. The special masters had concluded that wilful misconduct was established by the evidence.

E. COUNT 5: ABUSE OF POWER TO MAKE FEE ORDERS

The Commission relied on two incidents to support its finding that petitioner had abused his power to make fee orders.

---

[22] Penal Code section 987.8, subdivision (b), authorizes a fee hearing "upon conclusion of the criminal proceedings in the trial court." That language had been construed in *People* v. *Spurlock* (1980) 112 Cal.App.3d 323, 328 [169 Cal.Rptr. 320] as referring to the date of judgment. In conducting the preliminary hearing petitioner had acted as a magistrate, but argued that he believed the hearing was authorized because criminal proceedings in his court had concluded.

[23] The bail had actually been posted by defendant's relatives in the name of his father. Bail posted by a nondefendant must be returned on demand. (Pen. Code, § 1297.) That section authorizes the court to order bail deposits made by a defendant be applied to fines and costs if the funds "remain[ ] on deposit at the time of a judgment." Even that authorization does not permit application of the funds to attorney fees absent consent of the defendant. (*Gubler* v. *Commission on Judicial Performance* (1984) 37 Cal.3d 27, 42 [207 Cal.Rptr. 171, 688 P.2d 551].)

1. *Black*

Richard Black was represented by a deputy public defender at a five-day jury trial after which he was convicted of driving under the influence and found to have suffered two prior convictions. The public defender had made only one pretrial appearance on his behalf, to announce readiness for trial. On February 24, 1984, Black was sentenced to 150 days in the county jail, and a fine of $586 with a $30 assessment was imposed on February 24, 1984. Then, without advising the defendant of his right to a hearing, and without taking any evidence on the cost of the services or the ability of the defendant to pay, petitioner ordered him to reimburse the county $2,000 for the services of the public defender. When the public defender protested that the amount was excessive and asked for a hearing, petitioner responded that "you've had it" and chastised counsel for misuse of county funds in making the inquiry on behalf of the defendant.[24] Petitioner told the defendant that if he did not pay the attorney fees he would remain in jail, and later told counsel, who had inquired again, that the defendant could sell his car to pay the fees since he was to lose his right to drive for three years.

The defendant's 10-year-old car was owned by his parents. The defendant had no money of his own. A declaration subsequently filed by the public defender calculated the cost of representing the defendant as $715. A modification hearing was held on August 27, 1984, at which petitioner made no inquiry into the ability of the defendant to reimburse the county. When the public defender argued that the cost to the county for the representation was substantially less than the reimbursement ordered, petitioner told him that the subject of the hearing was civil in nature and that his expenditure of time was an abuse of county funds. The fee award was reduced to $750. Petitioner did not inform the defendant of his right to seek modification. The defendant's parents paid the county $750.

Petitioner did not dispute his failure to comply with the statutory prerequisites to a fee award. He explained that he had based his order on his knowledge that the defendant owned a sports car worth between $8,000 and $12,000, and evidence at trial which led him to conclude that the defendant raised and sold livestock. In fact, the evidence at trial did not establish that

---

[24] Penal Code section 987.8, subdivision (a), requires notice and hearing before a fee reimbursement order is made. The notice must specify the cost of legal assistance provided, and advise the defendant of his procedural rights. (*id.*, subd. (d).) At the hearing the defendant is entitled to be heard in person, to present evidence, to confront and cross-examine witnesses, to have the evidence disclosed to him, and to receive a written statement of the findings of the court. (*id.*, subd. (e).) The court must find that the defendant has the present ability to pay before making a reimbursement order.

the defendant owned the car free and clear, or that he owned and traded in livestock. As noted, he did not own the car. His parents, who had purchased it for $2,500, did. His livestock consisted of a leased mare he hoped to breed.[25]

The Commission found that petitioner acted in bad faith in this matter and concluded that his actions constituted wilful misconduct.

### 2. *Marshall*

Petitioner's conduct in this matter is also the subject of the third incident in count 4. On June 6, 1984, at the close of a preliminary hearing, petitioner conducted a hearing in which he assessed attorney fees of $1,500 to be paid by the defendant and ordered that it be taken out of the bail the defendant had posted.

Petitioner had given the defendant no notice that the hearing was to be held, or of his rights, and made the order without regard to the ability of the defendant to pay for attorney services. No evidence was presented on the cost of public defender services. The deputy who had represented the defendant had made five brief appearances other than the preliminary hearing, and had done very little preparation. Petitioner concluded that 20 hours had been spent on the case, and charged the defendant $75 per hour.

The special masters found that this incident was wilful misconduct, but the Commission concluded that petitioner's actions constituted only prejudicial conduct. In so doing the Commission may have accepted petitioner's claim that he did not act in bad faith because he believed that Penal Code section 1297 authorized withholding of attorney fees from bail deposits. In concluding otherwise in *Gubler* v. *Commission on Judicial Performance, supra,* 37 Cal.3d at page 42, this court recognized that prior reliance on the

---

[25] At the hearing petitioner stated that he had calculated the cost of services of the public defender at $50 per hour. The deputy assigned was paid at a rate of $14 to $15 per hour. The Commission argues that petitioner could not have believed in good faith that the cost of a deputy public defender's services in San Bernardino County could be $50 per hour, but offers nothing to support this assertion other than the earning rate of the particular deputy. We need not decide here whether a reimbursement order must be tied to the cost of the particular deputy's service or may be based on an average cost of providing service. We note in this regard that the county's costs are not limited to the salary of the assigned deputy. They include the expense of supervisory and clerical personnel, investigators, general office expenses, and many other items of overhead.

It is arguable, therefore, that the cost might be measured by hours devoted to the particular defendant in relation to the total number of hours of client representation furnished by the office of the public defender to all clients during the fiscal year.

statute as authority for such orders would not constitute misconduct. As in *Gubler,* however, this incident involved not only the improper withholding order, but the summary manner in which the hearing was announced and conducted.

Petitioner's attempt to justify the procedure on grounds that neither the defendant nor his attorney objected, requested a continuance, or offered any evidence suggesting that the defendant was unable to pay, is unavailing. It is manifest that petitioner made no effort to accord basic procedural fairness to the defendant. Even assuming that petitioner was unaware of the substantive requirements of Penal Code section 987.8,[26] and that his conduct in that regard was simply judicial error, the manner in which the proceeding was conducted alone supports the Commission's conclusion.

Notwithstanding the initial determination that the defendant was eligible for public defender services, petitioner assumed that the bail posted in defendant's name was his, and ordered withholding without any evidence regarding the defendant's future needs.

The Commission findings and conclusion in this matter, as in the foregoing, are supported by clear and convincing evidence.

## IV.

### MITIGATION

The purpose of Commission proceedings is not punishment, but protection of the public, ensuring evenhanded and efficient administration of justice, and the maintenance of public confidence in the integrity of the

---

[26] Penal Code section 987.8 defines the term: " 'Ability to pay' means the overall capability of the defendant to reimburse the costs, or a portion of the costs, of the legal assistance provided to him or her, and shall include, but not be limited to, all of the following:

"(A) The defendant's present financial position.

"(B) The defendant's reasonably discernible future financial position. In no event shall the court consider a period of more than six months from the date of the hearing for purposes of determining the defendant's reasonably discernible future financial position. Unless the court finds unusual circumstances, a defendant sentenced to state prison shall be determined not to have a reasonably discernible future financial ability to reimburse the costs of his or her defense.

"(C) The likelihood that the defendant shall be able to obtain employment within a six-month period from the date of the hearing.

"(D) Any other factor or factors which may bear upon the defendant's financial capability to reimburse the county for the costs of the legal assistance provided to the defendant.

" . . . "

judicial system. (§ 18(c); *Furey* v. *Commission on Judicial Performance, supra,* 43 Cal.3d at p. 1320.) Our purpose is to determine the nature of the discipline, if any, that is necessary to achieve these goals. We therefore consider evidence offered by the judge in explanation and/or mitigation of his conduct. There can be no mitigation for maliciously motivated judicial misconduct, however. (*Gonzalez* v. *Commission on Judicial Performance* (1983) 33 Cal.3d 359, 377 [188 Cal.Rptr. 880, 657 P.2d 372].)

Petitioner was admitted to the bar in 1969 and served thereafter as a deputy district attorney in the office of the San Bernardino County District Attorney, becoming a chief deputy in 1976. He is married and has two children. He was elected to the bench and took office in January 1981. He was reelected in a contested election on June 3, 1986. He was elected presiding judge of the San Bernardino Municipal Court District for 1986 and was reelected for 1987.

Several witnesses, including colleagues on the bench and attorneys who appear before him, testified that petitioner is a person of unquestioned honesty and integrity. None of the charges against petitioner suggest otherwise. ■ This evidence, and that which confirms that petitioner had a good reputation for legal knowledge and administrative skills are not mitigating, however.[27] Honesty and good legal knowledge are minimum qualifications which are expected of every judge. (Cal. Code Jud. Conduct, canons 1 and 3.) Neither these qualities nor a judge's administrative skills can mitigate either "wilful misconduct" or "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." (§ 18(c).)

Moreover, petitioner's experience as a deputy district attorney suggests that he was well acquainted with the constitutional and procedural rights of criminal defendants. (*McCullough* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at p. 199; *Wenger* v. *Commission on Judicial Performance* (1981) 29 Cal.3d 615, 653-654 [175 Cal.Rptr. 420, 630 P.2d 954].) His conduct in the incidents in which defendants' rights were violated, in issuing orders to show cause and in the imposition of contempt sanctions, suggest that rather than using his knowledge and experience to ensure the

---

[27] Petitioner has filed motions to submit additional evidence in this court in the form of evidence that his sentence in the Dyer incident was not disproportionate in light of the defendant's prior record, which was known to petitioner. The motion is denied. Not only should such evidence have been presented at the hearing before the special masters, but it is irrelevant to the charge that petitioner failed to ensure the defendant's right to counsel, did not elicit proper waivers of the defendant's constitutional rights prior to accepting his guilty plea, and failed to obtain a presentence report.

rights of persons appearing in his courtroom, petitioner was impatient and frustrated by the need to comply with, and sought to avoid, procedures we deem necessary to the fair and evenhanded administration of justice.[28]

■ The testimony of persons who were not present, and thus cannot assess the serious nature of the incidents of misconduct, but nonetheless believe petitioner to be a fair and patient person whose judicial temperament is appropriate, also is not persuasive. (*Cannon v. Commission on Judicial Qualifications, supra,* 14 Cal.3d at pp. 705-707.) The record belies petitioner's claim that he has learned from past experience and has modified his courtroom behavior.[29] It demonstrates instead an inability to appreciate the importance of, and conform to, the standards of judicial conduct that are essential if justice is to be meted out in *every* case.

■ That petitioner's conduct of other proceedings during his tenure on the bench has been unremarkable cannot overcome the evidence of a continuing, pervasive pattern of misconduct. (*Gonzalez v. Commission on Judicial Performance, supra,* 33 Cal.3d at pp. 377-378.) Four charges of wilful misconduct and twenty-one charges of prejudicial conduct[30] have been established. The incidents underlying these charges occurred over the full span of petitioner's judicial career, continuing until and after receipt by the Commission of the first complaint in 1985. Petitioner's lack of judicial temperament is manifest.

The record does not suggest that petitioner has, or will be able to, overcome this trait and that similar incidents will not recur. For this reason

[28]Petitioner offered evidence in the form of the opinion of Judge Martin A. Hildreth, presiding judge of the county, who has been a judge of the municipal court since 1973, that petitioner was the "finest administrator we've ever had as a Presiding Judge." Qualities as an administrator, however, do not translate into an ability in the individual case before the judge to be "patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom judges deal in their official capacity" (canon 3A(3)), and to accord "every person who is legally interested in a proceeding, or that person's lawyer, full right to be heard according to law . . . ." (Canon 3A(4).)

[29]We acknowledge, in this regard, the testimony of Attorney Thomas B. Ritchie, a past president of the Western San Bernardino Bar Association, that petitioner has matured in office, has become one of the finer judges sitting in the West Valley court, and is now well respected. The same witness offered evidence that petitioner has served the community off the bench as a director of the Inland Mediation Board, and in bench/bar committee work.

Numerous attorneys and judges offered evidence of their experience in petitioner's court and their observations of his performance, all expressing admiration and a view that he should be commended for the quality of his service on the bench, rather than censured or removed.

[30]This number does not include those acts of prejudicial conduct also found to be wilful misconduct.

comparison of the discipline imposed in other cases, as petitioner suggests, is not fruitful. Our role is to determine, in the individual case, the action necessary to protect the public and the reputation of the judiciary. The evidence fully supports the conclusion of the Commission that this purpose requires that petitioner be removed from the bench.

## DISPOSITION

We order that Judge Kenneth Lynn Kloepfer, judge of the San Bernardino Municipal Court District, San Bernardino County, be removed from office. He shall, however, if otherwise qualified, be permitted to resume the practice of law (Cal. Const., art. VI, § 18, subd. (d)) on condition that he pass the Professional Responsibility Examination. This order is effective upon the finality of this decision in this court.

Petitioner's application for a rehearing was denied January 25, 1990. Kaufman, J., did not participate therein.