*CJP Supp. 150 Opinion
GROSSMAN, Chairperson.
I. INTRODUCTION AND SUMMARY
This disciplinary matter concerns Judge Diana R. Hall, a judge of the Santa Barbara County Superior Court, whose current term began in 2002 after she won reelection in the contested election that is a subject of these proceedings. At the time of the election, the judge lived in a romantic relationship with Deidre Dykeman and did not want that fact generally known. Ms. Dykeman gave the judge $20,000 for the reelection campaign—approximately half of the total amount of contributions. Concerned that the contribution might raise questions about the relationship, the judge deposited the $20,000 into her own personal checking account to conceal its source. During the campaign, she signed four campaign disclosure statements under penalty of perjury listing herself as the source of the $20,000, knowing that to be false. She undermined the fair electoral process with her deceit and misrepresentations. At a minimum, there is an appearance Judge Hall holds her judicial office as the result of election fraud.
Judge Hall claims she violated campaign finance and disclosure laws inadvertently, as the result of not reading them. She further asserts she had a legitimate belief her partner’s separate funds belonged to the two of them. We regard these attempts to minimize the wrongdoing as aggravating the underlying campaign violations.
*CJP Supp. 151 Additionally, Judge Hall has two misdemeanor convictions by a jury for driving under the influence of alcohol (DUI). She also improperly questioned a prosecutor concerning his reasons for exercising an unqualified right to disqualify her in a judicial proceeding, knowing that doing so was improper.
We order Judge Hall removed from office because of the seriousness and breadth of her misconduct. Further, we issued a private admonishment against Judge Hall last year for conduct that shows an alarming disrespect for authority. The judge committed the misconduct underlying the private admonishment when she knew this commission was investigating her in connection with the current charges. She thereby also has shown an inability to control her behavior, demonstrating the strong likelihood she will continue to commit misconduct in the future.
The commission commenced this inquiry with the filing of its notice of formal proceedings (Notice) on July 25, 2005, setting forth the charges against Judge Hall in three counts. We discuss the charges beginning at page 152, post. The judge filed her amended answer (Answer) on October 26, 2005. At the request of the commission, the Supreme Court appointed three special masters to hear and take evidence and report to the commission under Rules of the Commission on Judicial Performance, rule 129. (All references to a rule are to the Rules of the Commission on Judicial Performance.) The three masters held a three-day hearing during November 2005.
Immediately following the conclusion of the November hearing, the commission received information that caused it to conclude that, at a minimum, the appearance of the fundamental fairness of the proceedings had been irreparably compromised. We immediately issued a stay, and on December 23, 2005, we petitioned the Supreme Court to appoint a successor panel of special masters to hear the matter de novo. (In re Judicial Disciplinary Proceeding Concerning Judge Diana R. Hall (Jan. 4, 2006, S139619).) The court granted the commission’s petition on January 4, 2006 (ibid.), and appointed new special masters on February 9, 2006. At the request of Judge Hall, on February 6, 2006, the commission ordered all transcripts of proceedings before the original panel of masters sealed. We have not seen those transcripts.
The presiding special master appointed by the Supreme Court in 2006 is Hon. Dennis A. Cornell, Associate Justice of the Court of Appeal, Fifth Appellate District. The other two special masters are Hon. Tani G. Cantil-Sakauye, Associate Justice of the Court of Appeal, Third Appellate District; and Judge Desiree A. Bruce-Lyle, Judge of the San Diego County Superior Court. They held an evidentiary hearing in Ventura April 24 through 26, 2006, followed by oral argument in Sacramento on June 14, 2006. The *CJP Supp. 152 masters’ 51-page report to the commission, containing their detailed findings of fact and conclusions of law, was filed with the commission on July 26, 2006.
We base our decision to remove Judge Hall from office on the masters’ factual findings and legal conclusions, with which we agree in their entirety and which we adopt as our own in all respects. They resolved numerous credibility issues and factual disputes. We adopt their determinations in all instances.
Judge Hall is represented by Attorney Rebecca D. Lizarraga of Studio City, California. The examiners for the commission are Commission Trial Counsel Andrew Blum and Commission Assistant Trial Counsel Valerie Marchant.
II. ANALYSIS OF THE CHARGES AND EVIDENCE
The charges against Judge Hall appear in the Notice in three separate counts, which we discuss separately. Count 1 involves the judge’s misdemeanor drunk driving convictions, discussed at pages 152-153, post. Count 2 relates to campaign finance and disclosure violations (pp. 154-165, post), and count 3 concerns the judge’s improper questioning of a prosecutor as to why he was exercising a statutory right to assert a peremptory challenge against her (pp. 165-167, post).
The commission, through its examiner, has the burden of proving the charges against Judge Hall by clear and convincing evidence. (Doan v. Commission on Judicial Performance (1995) 11 Cal.4th 294, 313 [45 Cal.Rptr.2d 254, 902 P.2d 272] (Doan); Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1].) “ ‘[Cjlear and convincing’ evidence [is] ' “ ‘so clear as to leave no substantial doubt’; ‘sufficiently strong to command the unhesitating assent of every reasonable mind.’ ” ’ ” (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman).) “Evidence of a charge is clear and convincing so long as there is a ‘high probability’ that the charge is true. [Citations.] The evidence need not establish the fact beyond a reasonable doubt.” (Ibid.)
A. COUNT 1—FINDINGS OF FACT
Judge Hall admitted in her verified Answer, during her testimony, and in written stipulations, the charges in count 1 concerning her drunk driving. Based thereon, the masters and we find the judge committed the DUI violations. Paraphrasing the masters’ findings, the pertinent details follow.
*CJP Supp. 153 On December 21, 2002, in Santa Ynez, California, Judge Hall committed the misdemeanor offenses of driving under the influence of alcohol in violation of Vehicle Code section 23152, subdivision (a), and of driving while having a blood-alcohol level of 0.08 percent or higher in violation of section 23152, subdivision (b). A jury convicted her of the two DUI offenses and acquitted her of other charges the district attorney brought against her as part of the same proceedings.
In December 2002, Judge Hall was in a romantic relationship with Deidre Dykeman. The two had met in 1998 and had bought a house together in 1999 in which they both resided on December 21, 2002. They owned the property as tenants in common. They were not registered domestic partners under California law.
On December 21, the judge had a beer with lunch, and wine during the afternoon. She and Ms. Dykeman had an argument. Judge Hall left the house in her car after Ms. Dykeman called 911 to complain of domestic violence by the judge. The judge intended to drive to her office to phone someone.
While driving, Judge Hall saw a patrol car traveling at a high speed. She stopped; the officer turned on his lights and stopped behind her. A second patrol vehicle arrived. The judge was placed under arrest; her blood-alcohol level was 0.18 percent, or more than twice the legal limit.
The judge’s counsel notified the district attorney of the judge’s willingness to plead guilty to DUI charges. The judge changed her mind, however, when the district attorney filed additional charges against her, including a felony that carried a mandatory state prison sentence upon conviction. She went to trial on all the charges; the jury acquitted her of all charges, except for the two DUI misdemeanors which she admitted at trial and of which she was convicted.
Judge Hall testified she has ceased drinking alcohol since November 2005. In her Answer, the judge expressed deep remorse for driving while intoxicated. She also states she regrets that her impaired judgment led her to drive while under the influence of alcohol.
B. COUNT 1—CONCLUSIONS OF LAW
1. Violations of the Code of Judicial Ethics
Count 1 charges Judge Hall with violating California Code of Judicial Ethics canon 1 (all references to a canon are to the California Code of Judicial Ethics), which requires a judge to uphold and preserve the integrity *CJP Supp. 154 of the judiciary and to do so by maintaining high standards of personal conduct. We adopt the following conclusions of the masters that Judge Hall violated this canon as well as canon 2A, which requires a judge to respect and comply with the law and to act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary: “By driving a car when impaired by alcohol with a blood-alcohol level of more than two times the legal limit, Hall failed to observe high standards of conduct. Her conduct exhibited a complete lack of concern for the safety of others, an inability to control her impulses and poor judgment, thereby seriously injuring the integrity of the judiciary in the eyes of the public. This same conduct reflects her lack of respect for and compliance with the law in violation of canon 2A.”
2. Prejudicial Misconduct
The masters and we conclude the DUI violations and convictions constitute prejudicial misconduct within the meaning of article VI, section 18, subdivision (d) of the California Constitution. The Supreme Court has defined this category of misconduct by a judge as arising out of conduct which is not done in bad faith, “ ‘ “but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office” . . . .’ ” (Broadman, supra, 18 Cal.4th at p. 1092, citing Doan, supra, 11 Cal.4th at p. 312.) We adopt the masters’ apt summation of why drunk driving by a judge fits within this definition: “The offenses, driving under the influence of alcohol and driving with a blood-alcohol level above 0.08 percent are high profile, heavily legislated crimes. This is so because these types of crimes, while having the potential for serious and fatal injuries to the innocent public on the roadways, are preventable and yet not uncommon. When an elected official, especially a judge, is arrested for DUI, the arrest can often inflame the emotions of a community and often makes front page news. Thus, when a judge is arrested and convicted for DUI, it is prejudicial to public esteem for the judicial office.”
C. COUNT 2—FINDINGS OF FACT
Count 2 charges Judge Hall with election law violations, including that she illegally commingled campaign and personal funds, and filed four sworn false campaign finance statements, thereby engaging in improper political activity. We summarize the facts, again paraphrasing the masters. As we discuss, the judge disputes key facts and their significance.
*CJP Supp. 155 1. Ms. Dykeman’s $20,000 Contribution to Judge Hall’s Reelection Campaign
In the fall of 2001, Judge Hall learned she would have a challenger in her bid for reelection to the bench in March 2002. She formed a reelection committee consisting of herself and an acquaintance as treasurer. She also retained an election consultant.
The judge had no experience in fundraising or running a campaign, and she loathed asking people for money. She did not want to accept contributions either from friends or from anyone else, including attorneys appearing before her, who might believe they would gain influence or advantage in her court.
In the fall of 2001, Judge Hall was given, and signed a receipt for, a copy of the Fair Political Practices Commission (FPPC) “Manual A” containing election information for candidates, including judges, and their campaign committees. The judge “went through” the manual, but did not “review” the portion of it outlining the duties of officeholders, candidates and campaign treasurers, prior to giving the pamphlet to her campaign treasurer. She did not review the Government Code sections applicable to campaigns. The judge testified, though, that at the time of her campaign, she knew she was required to disclose campaign contributions. She also knew then that the filing of various campaign statements required her signature and verification.
In early 2002, Judge Hall believed her campaign needed more money. She discussed with Ms. Dykeman the amount of money needed and the options for sources of funds. The two women then lived together in a romantic relationship, although only family members and a few of the judge’s close friends knew that fact. Ms. Dykeman wanted to help with the campaign, but the judge discouraged it because she did not want members of the public to know of the relationship. The judge and Ms. Dykeman discussed holding a fundraiser at their home, but the judge did not want to do that, again because of her desire to keep the relationship confidential. They also discussed borrowing against the equity value of their house. Ms. Dykeman opposed that option. There was conflicting testimony whether the judge’s sister was in a position to loan the judge money for the campaign.
Ms. Dykeman proposed using money from her personal mutual fund investment accounts to build up the judge’s campaign coffers. Ms. Dykeman had the investment accounts before she met the judge, and the judge had not contributed any money to them. Ms. Dykeman testified the two of them discussed using funds from her investment accounts for the campaign and that she would go online and transfer the funds on an expedited basis. Judge Hall denied any such discussion. The masters accepted Ms. Dykeman’s *CJP Supp. 156 testimony on this point because they found it credible. We adopt their credibility assessment and finding because both appear reasonable and correct.
Ms. Dykeman withdrew approximately $20,000 from several of her investment accounts and wire-transferred them to her personal checking account. She promptly wrote a $20,000 check, dated February 3, 2002, drawn on that same account, payable to “Diana Hall” for the reelection campaign. Ms. Dykeman testified she asked the judge to whom she should write the check and the judge said to write it to her and she (the judge) would take care of it. The judge denied this conversation, but the masters and we adopt Ms. Dykeman’s version—primarily because, as the masters found, Ms. Dykeman was credible and without any motive to fabricate this portion of her testimony. Additionally, the masters found Ms. Dykeman’s inquiry concerning the payee comports with common experience of asking the recipient of a check to whom it should be made payable. We agree, particularly under the rather unusual circumstances present here, that the person writing such a check likely would ask to whom it should be made payable.
It is undisputed that when Ms. Dykeman gave her check to the judge, the two of them did not discuss whether the funds were to be repaid or otherwise reallocated between them. Ms. Dykeman testified that when she wrote the check and gave it to the judge, she did not expect the judge to return the $20,000, but there was no discussion whether it was a gift or a loan. From Ms. Dykeman’s perspective at the time, she wanted the judge to be happy and she considered her $20,000 to be an investment in their happiness and future. She did not expect the judge to return the money, in part because their relationship was fine at the time.
Judge Hall admits she never advised Ms. Dykeman that Ms. Dykeman might be required to file a campaign report under Government Code section 84105 because of the check. (All code section citations are to the Government Code unless otherwise indicated. All of the subject Government Code sections are part of the Political Reform Act of 1974 (§ 81000 et seq.; the Act).)
On February 12, 2002, Judge Hall wrote a check for $25,000 to her campaign from her personal checking account, to which she had deposited Ms. Dykeman’s $20,000 check. The source of funds for the judge’s check was Ms. Dykeman’s $20,000 and an additional $5,000 of the judge’s own money. The judge testified she was not aware at the time that the Act prohibited such commingling of funds. She gave her check to her campaign treasurer, who deposited it into the campaign account. She did not tell the treasurer that $20,000 of the funds came from Ms. Dykeman.
*CJP Supp. 157 2. The Four Campaign Statements
During the reelection campaign, on four separate occasions Judge Hall signed an FPPC Form 460 campaign report with attached schedules, including a monetary contributions received schedule and a campaign disclosure statement. (The masters and we refer to the 460 forms as “the campaign statements.”) Campaign statements, such as those signed by Judge Hall, are mandated by the Act (§§ 84200-84216.5) and require disclosure of detailed information about receipts and disbursements of money by a campaign committee. They are the primary means of providing transparency in connection with election finances; they directly implement one of the primary purposes of the Act—to ensure that “[Receipts and expenditures in election campaigns ... be fully and truthfully disclosed in order that the voters may be fully informed and improper practices may be inhibited.” (§ 81002, subd. (a).)
The four campaign statements Judge Hall signed cover the period January 20 through October 26, 2002. They consist of a preelection statement, an amended preelection statement, a semiannual statement and a termination statement. The judge signed all four statements under penalty of perjury, verifying pursuant to the preprinted text on each form, that she had “used all reasonable diligence in preparing and reviewing” each statement, and attesting to “the best of [her] knowledge” that the information on the forms and attached schedules is “true and complete.”
In contrast to the verification on each of the campaign statements, Judge Hall testified concerning the first one, the preelection statement, that she did not “review it to see that all the contributors were listed there.” There is no testimony concerning whether or the extent to which she reviewed the second, or amended preelection, statement. As to the third, the semiannual statement, she testified she did not read it before signing the verification. The judge “glanced over” but “did not read” the fourth, the termination statement. “There is no mention in any of Hall’s campaign statements that Dykeman contributed to Hall’s campaign. Hall did not list Dykeman’s $20,000 contribution as coming from Dykeman. [Citation.] In all of her campaign statements, under penalty of perjury, Hall listed herself as the sole source of the $25,000 knowing that Dykeman contributed $20,000 of the $25,000 from [Dykeman’s] own funds. [Citations.]”
The judge testified that when she filed her campaign statements, she did not know the Act required her to report the $20,000 from Ms. Dykeman as either a contribution or a loan.
After the election, Judge Hall learned there was campaign money left over, which she returned to Ms. Dykeman, even though Ms. Dykeman did not *CJP Supp. 158 believe that was the preferable disposition of the unused funds. In addition to returning those excess campaign funds, the judge began the process of repaying Ms. Dykeman the balance of the $20,000 by paying the entire mortgage installment payment for several months and paying for substantial home improvements and other items. Ms. Dykeman testified she felt the judge repaid the $20,000 contribution in full.
Judge Hall testified that Ms. Dykeman’s $20,000 constituted roughly half of the total combined contributions to her campaign. She admits she did not report Ms. Dykeman’s $20,000 on any campaign statement—as either a loan or a contribution—even after she began repaying the money. We discuss her explanations for these repeated nondisclosures next.
3. Judge’s Explanation for Nondisclosure of Ms. Dykeman’s $20,000
Judge Hall did not want it known that Ms. Dykeman contributed to the judge’s campaign. The judge testified that her relationship with Ms. Dykeman was her first same-sex relationship. In the judge’s view, disclosure of the relationship would have made her job very difficult in the conservative area in which she was running for reelection. She also testified she told Ms. Dykeman that although as a judge she was a public official, their relationship would need to remain nonpublic.
In response to questioning by the examiner whether the judge was concerned about the relationship becoming known if Ms. Dykeman’s name appeared on her campaign statements, Judge Hall testified, “the honest answer is I never really thought about it.” However, in earlier testimony under oath in her drunk driving trial, the judge testified she claimed the money as her own because she did not want people to know Ms. Dykeman had given her money and did not want Ms. Dykeman’s name on reporting records. She admitted before the masters she was telling the truth in that DUI trial testimony.
The masters’ reaction to the foregoing, with which we concur, was the following strong rejection of the judge’s claim: “Based on this evidence, we find Hall intentionally evaded the reporting requirements. We reject Hall’s ‘honest answer that she never really thought about it’ and her feigned ignorance of the reporting requirement.”
The judge also testified she considered Ms. Dykeman’s $20,000 to be jointly owned. Allegedly, she therefore believed she did not need to disclose the source of those funds. She testified she considered the $20,000 “our *CJP Supp. 159 money” because of a combination of factors, including the intimate relationship, the partners’ co-ownership of the house in which they lived, and their practice of sharing household expenses. The judge’s claim is irreconcilable with Ms. Dykeman’s testimony that she, Dykeman, had wanted to merge finances, but the judge refused. Ms. Dykeman testified the judge said, “her money was her money, and my money was my money; and she wanted us to keep our financial documents separate.”
Further, all the evidence clearly showed the two partners divided expenses and regularly made certain on an ongoing basis their respective contributions to the household were roughly equal. “Together, they lived in a romantic partnership, maintaining their separate accounts, sharing expenses by equalizing costs of the mortgage, property taxes, home improvements, groceries and entertainment. [Citations.]” As the masters summarized the issue, “based on the history and financial practices of the relationship, we find no basis in fact or law for Hall’s position that the $20,000 was ‘our money.’ ” We concur.
4. Violations of the Political Reform Act
In her Answer, Judge Hall admits violating the Act in that she did not comply with the terms of sections 84105 and 84211, subdivisions (f), (g). She also admits that under section 84216, subdivision (b)(3), reporting of Ms. Dykeman’s $20,000 was required under section 84211, subdivision (g). In summary terms, section 84105 requires a candidate or committee receiving contributions of $5,000 or more from any person to inform the person he or she may be required to file campaign reports. Section 84211, subdivision (f) specifies details regarding reporting of cumulative contributions, including loans of $100 or more; section 84211, subdivision (g) specifies the reporting details in the case of cumulative amounts of loans of $100 or more. Under section 84216, subdivision (b)(3), certain loans must be reported at the time of receipt if the money is used for political purposes.
Additionally, the judge admits commingling the funds from Ms. Dykeman’s investment funds with her own funds in her own personal checking account, and then writing her own $25,000 check consisting of funds from the two different sources. Section 84307 prohibits such commingling.
Although Judge Hall admits the foregoing violations of the Act, she claims she did not willfully violate the law because she was ignorant of its requirements at the time of the violations. The masters, and we, reject the judge’s claim. “Simply put, Hall is attempting to diminish the severity of her actions by using her self-imposed ignorance to defeat a knowledge requirement. She fails.”
*CJP Supp. 160 We also agree with the masters, for the reasons they and we explain, that Judge Hall intentionally failed to report Ms. Dykeman as a contributor. Most importantly, she admitted as much under cross-examination under oath in her DUI trial. The judge admitted before the masters she was telling the truth in her earlier testimony, which was as follows: “[Prosecutor]: And, I mean, you even went to the extent that when [Ms. Dykeman] gave you this $20,000 for your campaign, that you actually claimed it as your own money, didn’t you, because you didn’t want to report Ms. Dykeman’s name on the reporting records? You didn’t want people to know that Ms. Dykeman had given you any money; isn’t that right?
“[Judge Hall]: That’s correct.”
Second, clear and convincing circumstantial evidence supports the finding of the judge’s intentional nondisclosure of Ms. Dykeman’s $20,000 contribution. As described by the masters, the combination of the following five considerations leads inexorably to such finding.
(1) The judge admitted she knew she had a duty to disclose campaign contributions. In fact, her campaign statements list many contributors.
(2) The judge did not want to include Ms. Dykeman’s name in the reporting because of concern that the largely secret relationship would not remain confidential.
(3) The judge feared that if her relationship became known, the knowledge would negatively affect her reelection.
(4) The judge in fact did not disclose Ms. Dykeman’s name.
(5) The judge accomplished her goal of hiding Ms. Dykeman’s identity by orchestrating the transfer of funds in a manner to camouflage the source. The judge told Ms. Dykeman to write the check to her personally; she then put the money in her own personal account, and did not tell her treasurer that 80 percent of her $25,000 personal check was Ms. Dykeman’s money. There is no evidence the judge directed anyone else to write a check to her personally, or that she ran any other check for the campaign through her personal checking account en route to the campaign account.
The masters rejected Judge Hall’s assertion that her close relationship with Ms. Dykeman justified the nondisclosure of her partner’s contribution. We also reject the claim. The two women were not registered domestic partners. Furthermore, they in fact kept their finances strictly separate, constantly ensuring roughly equal sharing of joint costs and disbursements, at the *CJP Supp. 161 judge’s insistence. The judge’s claim that her relationship with Ms. Dykeman cloaked Ms. Dykeman’s $20,000 with a special status, somehow insulating it from disclosure requirements, is evidence of a “further irresponsible ignorance of the law,” rendering the defense “specious at best,” according to the masters. We agree.
5. Stipulated Dismissal of Charges of Additional Violations of Political Reform Act
The charges against Judge Hall include that she also violated sections 84301, 84302, 87207, subdivision (a)(5) and 87461, subdivision (a), all of which are part of the Act. The examiner stipulates there were no violations of these provisions, and we now dismiss those charges both because the stipulation is well founded and because there is no evidence Judge Hall violated any of these sections.
Section 84301 states that no person may contribute to a campaign other than in the contributor’s legal name. This section appears to be directed at the person who contributes the money. Ms. Dykeman was the source of the $20,000. By listing herself as the contributor, the judge did not provide the correct legal name. However, the masters accepted the examiner’s concession that this section is inapplicable, and we do the same. To the extent the section may apply to these facts, it does so only in a technical, tangential way. The violations of the sections discussed previously in part 2.A.4. (beginning at p. 159, ante) more appropriately apply to the gravamen of the wrongdoing that occurred. This charge is dismissed.
Section 84302 prohibits a person from contributing as an agent or on behalf of another person without making specified identifying information. There is no evidence of any violation of this section. This charge is dismissed.
Under section 87207, subdivision (a)(5), certain information must be provided concerning campaign income, including in the case of a loan, the annual interest rate, any security, and the terms of the loan. As the masters note, there is no evidence Ms. Dykeman loaned the $20,000 to the judge. Ms. Dykeman testified that when she gave the money to the judge, .she had no expectation of seeing the money again. She was surprised when the campaign ended with a surplus and argued in favor of doing something other than returning the excess funds to her. The contribution did not originate as a loan and there is no evidence there ever were any loan negotiations. There is no evidence of a violation of section 87207, subdivision (a)(5). This charge is dismissed.
*CJP Supp. 162 Section 87461, subdivision (a) prohibits any specified elected government official from receiving a personal loan of $500 or more, absent a written lending agreement subject to certain requirements. Again, there is no evidence that when Ms. Dykeman gave the judge $20,000 she intended it to be a loan. That the judge later voluntarily decided to repay the $20,000 does not change the fact that when given, it was a contribution, not a loan. This code section thus is inapplicable and this charge is dismissed.
6. False Sworn Declarations
Count 2 charges Judge Hall signed each of the four campaign statements under penalty of perjury knowing they were false because they incorrectly list the judge as the source of the $20,000. The judge testified she signed all four campaign statements under penalty of perjury and they all bear her signature. All four statements falsely identify the judge as the sole source of the $25,000 represented by her personal check to her campaign when she knew $20,000 of that amount came from Ms. Dykeman.
The judge admits she did not disclose Ms. Dykeman as a campaign contributor and admits she did not disclose Ms. Dykeman as the source of the $20,000. As a result, the masters found that Judge Hall signed all four campaign statements under penalty of perjury knowing each of them contained false information. We agree. The judge’s nondisclosure of Ms. Dykeman as the true source, and the concomitant false representation of the judge as the source, are highly material because her misconduct subverts a core purpose of the Act—that “the voters may be fully informed and improper practices may be inhibited.” (Gov. Code, § 81002, subd. (a).)
D. COUNT 2—CONCLUSIONS OF LAW
1. Violations of the Code of Judicial Ethics
Judge Hall violated five sections of the Act; she commingled funds, intentionally concealed Ms. Dykeman as the source of nearly half of all of her campaign contributions, and signed four declarations under penalty of perjury knowing they were false. The charges against her are that this behavior constitutes inappropriate political activity in violation of canons 1, 2A and 5. We have noted the dictates of canons 1 and 2A on pages 153-154, ante. Canon 5 requires judges to refrain from inappropriate political activity. The masters and we conclude the judge violated each of those canons. Their summary statement, which we adopt, is as follows: “[W]e conclude that all three canons are violated when an incumbent judge running in a contested election violates the applicable law, and then attempts to excuse her conduct by claiming ignorance of the applicable law. This is a strict standard of liability.”
*CJP Supp. 163 Judge Hall violated canon 1 by failing to maintain a high standard of conduct when she failed to read the law governing her reelection and then violated it. She also violated the provision of canon 2A requiring judges to promote public confidence in the judiciary. Public confidence in the judiciary is seriously impacted when the public learns a judge, one who is entrusted to apply the rule of law, does not read, and therefore does not abide by, the law. The public can have no confidence in a judge, and hence a judiciary, that is required to know and respect the law but does neither.
The judge also violated the directive of canon 5 that a judge refrain from inappropriate political activity. The masters stated, “we can think of no greater inappropriate political activity than an incumbent judge ignoring then violating the law applicable to a judicial campaign.” We agree. Any candidate for judicial office must know and strictly adhere to all applicable election laws; utmost integrity is required of every candidate for judicial office.
As the masters noted, there is strict liability for violations of the Political Reform Act. One may violate the reporting requirements of the Act through negligence or inadvertence, exposing the candidate to administrative penalties or civil liability. (§§ 83116.5, 91004.) The FPPC takes into consideration whether the violation was “deliberate, negligent or inadvertent,” in determining the appropriate penalty. (Cal. Code Regs., tit. 2, § 18361.5, subd. (d)(3).)
It is a misdemeanor for a person to violate the Act knowingly or willfully. (§ 91000, subd. (a).) Criminal charges were brought against Judge Hall for these violations. She entered into a diversion agreement with the prosecutor under which the criminal charges were suspended pending resolution of these commission proceedings. The agreement provides that upon resolution of this matter, the prosecutor will dismiss the criminal case provided the judge has no intervening criminal conviction and commits no interim campaign violations.
The FPPC has primary responsibility for enforcing the Act, including as to candidates for judicial office. That agency may consider it mitigating when a candidate violates the Act through inadvertence due to lack of familiarity with the intricacies of the law. However, because of the additional constraints imposed by the canons on a candidate for judicial office, we consider a claim by a judicial candidate of “ignorance of the law” as a defense to a wide-ranging violation of the law, such as here, to aggravate the violation itself. It is axiomatic that candidates for judicial office are obligated to know the requirements of the law and to conduct their election campaigns in strict accordance with it.
*CJP Supp. 164 2. Prejudicial Misconduct
We agree with the masters that Judge Hall’s campaign violations constitute prejudicial misconduct. One of the requirements for willful misconduct—that the misconduct occur while the judge is acting in a judicial capacity—is lacking. She violated the Act, including by knowingly signing false campaign statements under penalty of perjury, as a candidate and not in her judicial capacity. “A judge is acting in a judicial capacity while performing one of the functions, whether adjudicative or administrative in nature, that are associated with the position of a judge or when the judge uses or attempts to use the authority of the judicial office for an improper purpose.” (Broadman, supra, 18 Cal.4th at p. 1104, citing Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 172 [48 Cal.Rptr.2d 106, 906 P.2d 1260].)
We are not aware of any California case that directly considers the issue of whether an incumbent judge running for reelection is acting in a judicial capacity while campaigning. However, the Pennsylvania Supreme Court has considered the issue. It held that a judge’s signing false campaign statements did not constitute misconduct in office because the judge did not execute the reports in the course of official duties, that is, as part of “the judicial decision-making process.” (In re Cicchetti (2000) 560 Pa. 183 [743 A.2d 431, 438-441].) This highly analogous holding persuades us Judge Hall was not acting in a “judicial capacity” when she committed the violations at issue. The labeling of the misconduct does not diminish its seriousness or affect the level of appropriate discipline.
Judge Hall’s campaign misconduct is prejudicial misconduct within the meaning of the California Constitution. As concluded by the masters, it is “unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity.” (Citing Broadman, supra, 18 Cal.4th at pp. 1092-1093 and Doan, supra, 11 Cal.4th at p. 312.) “In this context, bad faith means a culpable mental state beyond mere negligence and consisting of either knowing or not caring that the conduct being undertaken is unjudicial and prejudicial to public esteem. In sum, to constitute prejudicial conduct, a judge’s actions must bring ‘the judicial office into disrepute,’ that is, the conduct would appear to an objective observer to be prejudicial to ‘ “public esteem for the judicial office.” ’ [Citation.]” (Broadman, supra, 18 Cal.4th at p. 1093.)
In our previous explanation that Judge Hall’s campaign violations also violated the canons of judicial ethics (pp. 162-163, ante), we concurred in the masters’ conclusions that the judge has brought the judiciary into disrepute and that her conduct is prejudicial to public esteem for the judiciary. The *CJP Supp. 165 masters also concluded that Judge Hall’s irresponsible failure as a judge running for election to read the applicable campaign laws “goes beyond mere negligence” within the meaning of Broadman. We agree. We conclude, as did the masters, based on the quoted legal standards, that Judge Hall committed prejudicial misconduct when she violated the Act as described here, including when she swore to the accuracy of the four campaign statements she knew were false.
E. COUNT 3—FINDINGS OF FACT
Count 3 charges that Judge Hall asked Deputy District Attorney (DDA) Kevin Duffy to explain why he had filed a peremptory challenge against her under Code of Civil Procedure section 170.6 (170.6), and threatened to report him to the district attorney. The charges assert such behavior violated canons 1 and 2A. As we discuss, there is not clear and convincing evidence Judge Hall threatened to report Mr. Duffy to his ultimate supervisor, the district attorney, and that portion of the charge is dismissed.
When a 170.6 challenge is properly and timely filed, a judge must accept the disqualification without inquiry. (McCartney v. Commission on Judicial Qualifications (1974) 12 Cal.3d 512, 531-532 [116 Cal.Rptr. 260, 526 P.2d 268].) Judge Hall does not dispute the validity of DDA Duffy’s 170.6.
The judge admits she knew she could not question Duffy’s challenge of her, and she consistently and absolutely denies she did so. However, Duffy and his opposing counsel on the case in question, Deputy Public Defender (DPD) Mary Johnston, both testified Judge Hall did question Duffy. The masters resolved this fact dispute against the judge. Their determination rests on an assessment of the credibility of the various witnesses whom they observed and heard. There is no evidentiary basis or other reason for us to second-guess their evaluation of the situation, and we adopt their finding that Judge Hall did ask Duffy why he was challenging her.
When the commission filed its charges against Judge Hall, it provided discovery to her that included a copy of a memo Duffy wrote, dated June 25, 2001, in which, among other topics, he described the 170.6 incident he asserts occurred earlier that day in a case named People v. Hernandez. Upon receipt of that discovery document, the judge located Duffy’s 170.6 declaration in the Hernandez file and obtained the transcript of the Hernandez case and of her entire morning calendar for June 25, 2001. She testified she reviewed the transcript several times, which refreshed her recollection of the 170.6. She recalled the Hernandez hearing.
The transcript of June 25, 2001, shows the Hernandez case was one of numerous matters on Judge Hall’s morning calendar. The attorneys and the *CJP Supp. 166 judge discussed scheduling issues in Hernandez. For some reason, the 170.6 that Duffy filed on June 22 was not in the file; he still had the original document on June 25. Duffy advised the judge of the 170.6, whereupon she reassigned the case to a different judge.
Duffy testified Judge Hall heard other cases after Hernandez, and then, during a lull called him to the bench to discuss the 170.6. He asserts the judge said during the ensuing sidebar conversation that she knew she was not supposed to ask him why he had challenged her, but she wanted to know “why did you do this?” He also claims Judge Hall said she was going to report him through the presiding judge to his ultimate supervisor, Santa Barbara County District Attorney Thomas. Sneddon, and that Duffy would be in Sneddon’s office to explain himself. Finally, Duffy testified the judge threatened to have domestic violence cases reassigned to a judge whom prosecutors frequently disqualified, which Duffy interpreted as a threat. His observation was that Judge Hall appeared quite angry, although she spoke quietly.
Duffy testified defense counsel frequently challenged Judge Hall while the prosecutor rarely did so. Judge Hall’s counsel agreed with Duffy on these points in her opening brief to the commission pursuant to rule 130(a). Duffy was surprised and shocked Judge Hall called him to the bench because he had never seen her question a defense lawyer who challenged her. He reported the incident widely in his office, including to his immediate supervisor, Christy Stanley Schultze. Ms. Schultze told Duffy to write up the incident so she could alert District Attorney Sneddon, in case Judge Hall or the presiding judge called Sneddon.
Duffy testified he wrote down his 170.6 experience in a memo on the same day it happened, June 25, 2001; his recollection was he sent the memo as an attachment to an email to Ms. Schultze. The memo contained information on the Hernandez matter, other cases Duffy had prosecuted before Judge Hall, and his personal opinions of Judge Hall.
Judge Hall testified to having very different recollections of all of the subject matters in Duffy’s memo. The judge’s counsel vigorously cross-examined Duffy about many of the assertions in his memo and succeeded in our view in impeaching him on many of the collateral matters in that document. Further, the masters found the judge refuted Duffy’s opinions of any prejudices she allegedly holds against victims of domestic violence. Based on our reading of the transcript of the hearing before the masters, we agree with this latter point and adopt the masters’ finding concerning it.
DPD Mary Johnston was Duffy’s opposing counsel on the Hernandez matter and was in court with him before Judge Hall on June 25, 2001. She *CJP Supp. 167 does not remember many of the details of what happened in connection with a 170.6 incident between the judge and Duffy. She testified clearly, however, that she remembered one occasion when Duffy motioned for her to accompany him to the bench after Judge Hall had summoned him to approach. At the sidebar, she heard the judge ask Duffy “why are you papering me?”—a colloquialism for a 170.6 challenge—or words to that effect. She did not want to be involved in the exchange between the prosecutor and the judge, and backed away from the bench entirely.
Based solely on the testimony of DPD Johnston, the masters found that on June 25, 2001, Judge Hall did ask DDA Duffy why he had filed a 170.6 against her in the Hernandez case. They found a lack of clear and convincing evidence of the remainder of the charges of count 3. We agree in both respects.
F. COUNT 3—CONCLUSIONS OF LAW
1. Violations of the Code of Judicial Ethics
The masters concluded that when Judge Hall asked the prosecutor why he was challenging her in the Hernandez case, she again violated canons 1 and 2A. She failed to maintain the high standard of conduct required of a judge and acted without integrity. We agree.
2. Willful Misconduct
All three elements of willful misconduct within the meaning of article VI, section 18, subdivision (d) of the California Constitution are present. Judge Hall’s conduct was (1) unjudicial and (2) committed in her judicial capacity, and (3) she committed an act she knew was beyond her lawful power and thus acted in bad faith. (See Broadman, supra, 18 Cal.4th at p. 1091.) The masters concluded there was willful misconduct under the Broadman standard, as do we.
G. PRIOR DISCIPLINE
1. Admissibility of Prior Private Admonishment
The masters overruled Judge Hall’s objection and admitted into evidence the examiner’s exhibit 29, a private admonishment this commission issued against Judge Hall in 2005. The masters did not consider the prior discipline; they admitted it in response to the examiner’s assertion it was relevant to the commission’s determination of the appropriate sanction.
*CJP Supp. 168 The admissibility question is governed by rule 125(b), which provides as follows: “Any prior disciplinary action may be received in evidence to prove that conduct is persistent or habitual or to determine what action should be taken regarding discipline. Prior disciplinary action includes any disciplinary action which is in effect before the conclusion of a commission proceeding, including review by the Supreme Court.” (Rule 125(b), italics added.)
The judge’s two-fold argument against the admissibility of the admonishment was set forth in her “Objection to Admission of Examiner’s Exhibit, No. 29” (Objection or Obj.). We discuss each point separately.
Turning Private Discipline into Public: Judge Hall argued that admitting the admonishment “impermissibly and automatically” makes private discipline public. There is no prohibition in the Constitution, statute or any Supreme Court case against a private sanction becoming public. Furthermore, rule 125(b), by expressly making prior discipline admissible in formal proceedings, gives advance notice of the possibility of such an occurrence. The commission’s consideration of prior private discipline also is consistent with the established policy and practice of escalating discipline for successive misconduct. When, as here, we rely on prior private discipline, it is important that we explain that our disciplinary decision is informed or influenced by the fact the judge has committed other misconduct, and its nature.
In Doan, supra, 11 Cal.4th at page 340, the Supreme Court referred to the judge’s prior private admonishment in determining the appropriate level of discipline to be imposed. The commission also has considered prior private discipline in its public decisions in a number of recent inquiries. (E.g., Inquiry Concerning Ross (2005) No. 174, Decision and Order Removing Judge Ross from Office, p. 65 [49 Cal.4th CJP Supp. 79, 139] [advisory letter]; Inquiry Concerning Wasilenko (2005) No. 170, Decision and Order Imposing Censure and Bar, p. 33 [49 Cal.4th CJP Supp. 26, 58] [private admonishment]; Inquiry Concerning Hyde (2003) No. 166, Decision and Order Removing Judge Hyde From Office, pp. 16-20 [48 Cal.4th CJP Supp. 329, 352-356] [private admonishment and three advisory letters].)
Allowing Subsequent Misconduct to Exacerbate the Effect of Earlier Wrongdoing: All of the misconduct that is the subject of the formal charges occurred in 2001 and 2002. The incident that is the subject of the private admonishment occurred later, in January 2004. Judge Hall objects that consideration of the subsequent conduct violates the letter and spirit of the commission’s own rules and case law interpreting the rules. This latter assertion rests on Doan, where the Supreme Court noted that Judge Doan had failed to heed the warning that prior similar discipline represented. However, there is nothing in the court’s opinion suggesting that consideration of prior *CJP Supp. 169 discipline is limited to whether the judge heeded an earlier commission warning. Prior discipline is relevant to our disciplinary determination, irrespective of when the underlying misconduct occurred.
The express language of rule 125(b) defeats the judge’s assertion the commission cannot consider prior discipline based on subsequent conduct. The rule defines prior discipline as “any disciplinary action which is in effect before the conclusion of a commission proceeding, including review by the Supreme Court.” The determining consideration is not when the other misconduct occurred, but rather, that it resulted in discipline that had taken effect before the conclusion of the current proceeding.
Rule 125(b) further provides that prior discipline is admissible “to determine what action should be taken regarding discipline.” That a judge committed misconduct subsequent to the events underlying formal proceedings is a highly relevant factor in determining the appropriate discipline to impose. Indeed, Judge Hall committed the misconduct underlying the admonishment when she knew she was under investigation by the commission. She has shown her inability to control her behavior at a time one would expect her to be on her very best behavior. This fact is highly relevant to our decision concerning the appropriate level of discipline, as we discuss at page 173, post.
Judge Hall accepted the admonishment, allowing it to go into effect by operation of law (see rule 114(a)), with knowledge there were other serious allegations then pending against her—that is, those that form the formal charges here. Rule 125(b) put her on notice that the private admonishment would be admissible in the formal proceedings that likely would, and did, ensue. The masters correctly applied rule 125(b) and admitted the prior admonishment. We consider it in connection with determining the appropriate sanction.
2. Facts Underlying Admonishment
The following is a summary of the facts underlying the commission’s 2005 private admonishment of Judge Hall, as set forth in the admonishment.
On or about January 16, 2004, Judge Hall spoke with Judge Rodney Melville in his chambers, requesting that she have a seat in his courtroom for the arraignment and argument on a “gag order” before Judge Melville that day in the high profile criminal case against Michael Jackson. All the seats in the courtroom had been assigned either to members of the press or the public. Judge Melville initially agreed Judge Hall could sit near the bench area where his clerk and research attorney had assigned seats, but later suggested she *CJP Supp. 170 should sit in an overflow courtroom where she could watch the proceedings on closed circuit television. Judge Hall declined the latter suggestion.
In correspondence with the commission concerning the foregoing, Judge Hall stated she wanted to have District Attorney Thomas Sneddon “see me no worse off than before he had occasioned the wrath of his office to come down upon me following my irresponsible and unlawful act of driving under the influence of alcohol.” (Underscoring in judge’s correspondence.)
Judge Melville directed Judge Hall not to enter the main courtroom. In response to her reply that she would take a seat there, he said he would be required to call a bailiff if she disobeyed his order. In correspondence with the commission, Judge Hall admitted she defied Judge Melville’s directive and that she told him to do whatever he deemed necessary.
Judge Hall entered Judge Melville’s courtroom and took a seat assigned to the press. Assistant Court Administrator Darrel Parker came to the courtroom and asked Judge Hall to accompany him into chambers because Presiding Judge Clifford Anderson wished to speak with her on the telephone. She refused to do so without her attorney present, and refused to vacate her seat. A bailiff inquired if she was sitting in a seat assigned to her, to which she responded, “It is now.” At Mr. Parker’s suggestion, a chair was procured and placed in the back of the courtroom and Judge Hall was escorted to it.
III. APPROPRIATE SANCTION
1. Precedent
This case requires that we decide whether a judge who engages in materially deceitful and lawless conduct that undermines the electoral process, and thereafter attempts to explain it away with specious arguments and misleading testimony, should continue in judicial office. Our decision is that she should not. We order Judge Hall removed from office. Her misconduct is fundamentally at odds with the core qualities and role of a judge in our society.
In 2001, we ordered Judge Patrick Couwenberg removed from office because of his dishonesty in connection with his seeking appointment to the bench. He provided materially false information concerning his educational, professional and military background to various persons, including Governor Wilson. We concluded that “ ‘Judge Couwenberg’s falsehoods create the appearance that he obtained his judicial office by deceit.’ ” (Inquiry Concerning Couwenberg (2001) No. 158, Decision and Order Removing Judge Couwenberg from Office, p. 12 [48 Cal.4th CJP Supp. 205, 221].) At a *CJP Supp. 171 minimum, Judge Hall’s election-related nondisclosures and misrepresentations are of the same import and create a similar appearance; they also require the same result.
Honesty is a minimum qualification for every judge. (Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 865 [264 Cal.Rptr. 100, 782 P.2d 239] (Kloepfer).) If the essential quality of veracity is lacking, other positive qualities of the person cannot redeem or compensate for the missing fundamental. (Ibid.) Applying this principle enunciated by our Supreme Court, we removed Judge Patrick Murphy from office in 2001 based on his dishonesty.[1] Judge Murphy lied about claimed ill health, which we denounced as malingering, for the purpose of remaining on payroll while attending medical school in the Caribbean, among other activities, instead of working as a judge. (Inquiry Concerning Murphy (2001) No. 157, Decision and Order Removing Judge Murphy from Office [48 Cal.4th CJP Supp. 179].) We also removed Judge Ross from office last year, based in large part on his lack of honesty, candor and accountability. (Inquiry Concerning Ross, supra, No. 174 [49 Cal.4th CJP Supp. 79].)
In Michigan Judicial Tenure Com. v. Ferrara (1998) 458 Mich. 350 [582 N.W.2d 817], the Michigan Supreme Court ordered Judge Ferrara removed solely for fraud and lying to the press, the master and the commission. The court did not even reach the question of whether there was evidence supporting the underlying charges of misconduct.
Similarly, in In re Collazo (1998) 91 N.Y.2d 251 [668 N.Y.S.2d 997, 691 N.E.2d 1021], New York’s highest court ordered Judge Collazo removed based on his deceitful conduct during the investigation of the initial wrongdoing, noting that the original misconduct alone would not warrant removal. Commenting on the judge’s “lack of candor” and upholding the New York commission’s recommended removal, the Court of Appeals stated, “Particularly relevant here is our conviction that ‘deception is antithetical to the role of a Judge who is sworn to uphold the law and seek the truth’ [citations].” (668 N.Y.S.2d at p. 999.) The deception practiced by Judge Hall during her reelection campaign, as well as her specious arguments before the masters and us, are equally antithetical to, and inherently incompatible with, her duties to uphold the law and the search for truth.
The Florida Supreme Court removed a judge from office earlier this year for campaign misconduct very similar to that in which Judge Hall engaged. (Inquiry Concerning Renke (Fla. 2006) 933 So.2d 482.) The Florida Judicial *CJP Supp. 172 Qualifications Commission had recommended a public reprimand and $40,000 fine based on its findings that Judge Renke’s father had made very substantial campaign contributions that the judge disguised as earned income from which he then made loans to his campaign fund. In addition to the election fraud itself, Judge Renke—similar to Judge Hall—dissembled before the commission, arguing that the payments from his father were his share of a settlement to which he was entitled. Judge Renke claimed it was mere coincidence that he received the money at a time he was in need of campaign funds. The court upheld the commission’s rejection of this defense and removed the judge from office.[2]
In 2004, the judicial conduct board in Illinois removed a judge from office for false campaign statements, other election fraud and dissembling before the board when called to explain his conduct. (In re Golniewicz, Order (111. Cts. Com., Nov. 14, 2004).) Judge Golniewicz used his parents’ address within the subcircuit in which he was running for judicial office, concealing his actual residence in the suburbs. He also sent out deceptive advertising to the voters, telling them he was their “neighbor” and a lifelong resident of the subcircuit. Additionally, the judge violated state residency laws by residing outside the subcircuit from which he was elected, and by maintaining his voter registration and voting within a subcircuit in which he did not live. He gave dishonest testimony and evasive answers before the conduct board. (The judge also exhibited improper demeanor in three cases over which he presided.)
In a case involving one false sworn affidavit, the South Carolina Supreme Court recently approved a stipulated one-year suspension of a judge from office without pay. (In re Augustus (2006) 367 S.C. 364 [626 S.E.2d 346].) Judge Augustus claimed on a notarized continuing education compliance report that he had attended all three days of a seminar when he only had attended one day. He repeated the same misrepresentation to disciplinary counsel. Subsequently, the judge amended his compliance report by making a pen and ink change to the number of hours reported, without having the amended report renotarized or the change initialed by the notary. He also filed an amended, true response with disciplinary counsel. We observe that in many instances, financial realities may cause the suspension of a judge without pay for a year to have the same practical effect as removal.
2. Aggravating, Mitigating, and Other Considerations
In the masters’ report, they list factors in aggravation and mitigation as part of their discussion of each separate count. To a considerable degree, *CJP Supp. 173 the listed factors derive from testimony given by numerous character witnesses the judge called to testify before the masters. These witnesses, from many walks of life, described the judge as a beloved, respected and loyal friend, a mentor and role model. Five experienced attorneys who have appeared before her testified positively about her integrity, honesty, demeanor and impartiality. We have taken this evidence “ ‘into account in considering the totality of the circumstances.’ ” (Broadman, supra, 18 Cal.4th at p. 1112, quoting Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 912 [42 Cal.Rptr.2d 606, 897 P.2d 544].) However, it does not mitigate or excuse willful or prejudicial misconduct. (Broadman, at p. 1112; accord, Kloepfer, supra, 49 Cal.3d at p. 865 [lack of honesty cannot be mitigated or excused by other positive characteristics].)
Several witnesses described Judge Hall as a hard-working, conscientious and well-prepared jurist. The masters generally viewed these asserted character traits as mitigating considerations. We view such attributes as descriptive of a good judge. To the extent Judge Hall is possessed of these traits, it makes more unbelievable her claim that she somehow failed to read and follow the law governing her campaign. The masters described that alleged failure as an “appalling lack of common sense” and something the judge never satisfactorily explained. They also found her claimed ignorance to be feigned. That she was fully aware of the campaign law is more consistent with the character witnesses’ description of the judge as a jurist who was thoroughly versed in the law. Moreover, “a good reputation for legal knowledge and administrative skills,” although relevant to discipline, does not mitigate willful or prejudicial misconduct. (Kloepfer, supra, 49 Cal.3d at p. 865.)
The judge’s election fraud overwhelms other considerations and compels our removal decision. Judge Hall engaged in deceit and misrepresentations to keep her position as a judge. She also has dissembled before the masters and us with excuses to minimize fault, thereby demonstrating a lack of acceptance of, and accountability for, her wrongdoing. She demonstrated extreme lack of judgment when she drove drunk. She questioned an attorney’s disqualification of her, knowing the impropriety of doing so. Finally, her conduct during the Michael Jackson hearing last year demonstrates an alarming disrespect for the authority of the judge presiding over the case, the presiding judge of the Santa Barbara courts, and other court personnel. Her actions show the serious degree to which she is unable to control her behavior. That inability to exercise self-restraint, including when she knew she was under investigation by this commission, convinces us there is a strong likelihood she will reoffend in the future. We cannot run that risk and still fulfill our constitutional mandate to protect the public and the reputation of the judiciary.
*CJP Supp. 174 IV. ORDER REMOVING JUDGE HALL FROM OFFICE
Pursuant to the provisions of article VI, section 18 of the California Constitution, Judge Diana R. Hall hereby is ordered removed from her judicial office; pursuant to that section of the Constitution and rules 120(a) and 136 of the Rules of the Commission on Judicial Performance, Judge Hall hereby is disqualified from acting as a judge.
Commission members Mr. Marshall B. Grossman, Judge Frederick P. Horn, Mr. Michael A. Kahn, Mrs. Crystal Lui, Justice Judith D. McConnell, Mr. Jose C. Miramontes, Mrs. Penny Perez, Judge Rise Jones Pichón, Ms. Barbara Schraeger and Mr. Lawrence Simi voted in favor of all the findings and conclusions expressed herein and in the foregoing order of removal and disqualification of Judge Hall. Commission member Patricia Miller did not participate in this matter.

 Judge Murphy resigned from office just prior to the commission’s decision; the actual decision therefore became a public censure and bar against the judge, which appears to be the maximum sanction we may impose on a former judge. (Cal. Const., art. VI, § 18, subd. (d).)

 Two justices dissented concerning the sanction; they would have accepted the Florida commission’s recommendation, or remanded for the commission to consider a harsher penalty short of removal.